DEBBY GALL, APPELLANT, V. GREAT WESTERN SUGAR COMPANY, A CORPORATION, ET AL., APPELLEES.

363 N.W.2d 373

Filed March 1, 1985.   No. 83-636.

Robert G. Pahlke of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, for appellant.

John F. Simmons of Wright, Simmons & Selzer, for appellees.

KRIVOSHA, C.J., BOSLAUGH, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

Plaintiff-appellant, Debby Gall, alleges that the defendants-appellees, Great Western Sugar Company and its parent, Hunt International Resources Corporation, intentionally inflicted emotional distress upon her and breached their duty of fair and good faith dealing by certain telephone calls they caused to be made to her at her place of employment. In this appeal Debby Gall claims the trial court erred in sustaining Great Western's motion for summary judgment, in sustaining Hunt International's special appearance, and in dismissing her action as to both defendants. We affirm.

We first consider Debby Gall's claim that the trial court erroneously sustained Great Western's motion for summary judgment. As we recently reiterated, the primary purpose of the summary judgment procedure is to pierce the allegations made in the pleadings and show conclusively that the controlling facts are other than as pled, and thus resolve, without the expense and delay of trial, those cases where there exists no genuine issue either as to any material fact or as to the ultimate inferences to be drawn therefrom, and the moving party is entitled to judgment as a matter of law. Further, in considering a motion for summary judgment, the evidence is to be viewed most favorably to the party against whom the motion is directed, giving to that party the benefit of all the favorable inferences which may reasonably be drawn from the evidence. Additionally, the party moving for summary judgment has the burden of showing that no genuine issue as to any material fact exists; that party must therefore produce enough evidence to

demonstrate his entitlement to a judgment if the evidence remains uncontroverted, after which the burden of producing contrary evidence shifts to the party opposing the motion. *Witherspoon v. Sides Constr. Co., ante* p. 117, 362 N.W.2d 35 (1985).

Although not without contradiction, the various depositions, affidavits, answers to interrogatories, and responses to requests for admissions received in evidence, viewed most favorably to Debby Gall and giving her the benefit of all favorable inferences to be drawn from them, disclose the following facts relevant to the allegations in her petition. Debby Gall was employed at the Bank of Gering and was pregnant, the latter fact being known to one Elizabeth Voyles, a claims agent employed by Great Western, who received her salary from Hunt International. Carl Gall, Debby's husband, was employed by Great Western. On November 28, 1980, Carl Gall was involved in an employment accident, as the result of which he sustained an injury to his right forearm such as to create doubt as to whether his right hand could be saved. Great Western made arrangements and paid for Carl Gall to be treated at Denver, Colorado, by Dr. Frank Scott, a physician specializing in the treatment of hands. Debby Gall accompanied her husband to Denver. Elizabeth Voyles' first contact with Debby Gall appears to have occurred when Elizabeth Voyles telephoned Carl Gall in order to have him complete some documents. At this time Elizabeth Voyles talked with Debby Gall to determine whether the latter had a place to stay while in Denver. The two also talked with each other, during the times that Carl Gall underwent treatment in Colorado, with regard to facilitating payments of compensation by Great Western to Carl Gall. There seems to be no dispute with respect to the benefits paid by Great Western to Carl Gall. His workers compensation checks were sent to Debby Gall at her place of work, at her request. Debby Gall also asked to be called at work should information be needed.

After the Galls returned to Gering, Elizabeth Voyles, failing in her efforts to reach Carl Gall, telephoned Debby Gall at the latter's place of work on February 19, 1981, and advised her that Great Western had a job which could be performed by a

person with only one arm. Elizabeth Voyles stated that since it was not certain that Carl Gall's hand could be saved, it would be desirable that he accept this job, which had to be filled immediately and which paid more than the disability benefits he was receiving; that it was acceptable to Dr. Scott that he do so; and that if he did not accept the job, he would be fired and all his insurance would be canceled. It developed that although Dr. Scott had initially concluded that Carl Gall could return to work as of February 19, 1981, he changed his mind on February 26 and instituted a program of physical therapy. Elizabeth Voyles advised Great Western's plant manager that Carl Gall would not be able to return to work. Although Debby Gall received similar telephone calls at her work from Elizabeth Voyles after February 19, the record does not establish that she received any such telephone calls after February 26.

Debby Gall took offense to the calls, saying she was made to feel as if her husband were not doing anything. She immediately broke out in hives, to which she had a lifelong proneness, experienced intermittent headaches, became nervous, cried, could not accomplish her work at the Gering bank without help, experienced tiredness, and lost weight. The hives cleared up in an hour and a half or so, and the headaches responded to medication within 45 minutes. Debby Gall's mother testified by affidavit that at one time she was fearful her daughter might miscarry because she discharged blood; however, Debby Gall did not mention it. Debby Gall became concerned that if her husband were fired, there would not be insurance to pay for her pregnancy and delivery expenses. However, she was enrolled in an insurance program which provided such benefits through her own employment at the Gering bank. Although the physician treating Debby Gall's pregnancy wondered why she was tired and her weight fluctuated, she never mentioned the telephone calls to him. When she mentioned her headaches, he attributed them to her pregnancy. She underwent no special medical or other professional treatment for the complaints she attributed to the telephone calls. The record does not establish that Debby Gall made Elizabeth Voyles aware of the upsetting effects of the telephone calls.

Debby Gall left her employment in an advanced state of

pregnancy on May 29, 1981. Her child was born on July 1, 1981, and she did not return to work. The insurer providing coverage through the bank paid Debby Gall's pregnancy and delivery expenses; no claim was made to Great Western.

We have had a number of occasions to consider the law applicable to the intentional infliction of emotional distress, or the tort of outrage, over the last half century. This court held as early as 1934 that the intentional infliction of emotional distress is actionable even where no physical injury results. In *LaSalle Extension University v. Fogarty*, 126 Neb. 457, 253 N.W. 424 (1934), recovery was permitted where the creditor threatened to sue the defendant and counterclaimant debtor, appealed to the defendant's employer, and made the defendant's neighbors aware of the indebtedness, all "designedly and for the purpose of harassing the defendant until he would meet their demands, whether the sum claimed was justly due or not." *Id.* at 463, 253 N.W. at 426.

More recently, in affirming the sustainment of defendant's demurrer in *Paasch v. Brown*, 193 Neb. 368, 227 N.W.2d 402 (1975), we adopted the Restatement rule that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. Restatement (Second) of Torts § 46 (1965). We noted that the conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community. We then held that the failure to accomplish promptly the acts required by a court decree did not give rise to a separate tort action based on outrageous conduct.

In *Davis v. Texaco, Inc.*, 210 Neb. 67, 313 N.W.2d 221 (1981), plaintiff was splashed with hot radiator fluid at a filling station, whereupon her sister removed plaintiff's blouse to relieve the burns. They then twice asked for something with which to cover plaintiff and were finally given a dirty fender cover. Shortly thereafter, they decided to go to the hospital, but found their car would not start. The filling station attendant had removed an engine part and would not replace it until the

fender cover was returned. Finally, plaintiff was given a shirt to wear. In affirming the trial court's refusal to submit the cause to the jury, we held that plaintiff's embarrassment and humiliation did not rise to the level of distress required, again noting that the distress must be so severe that no reasonable person could be expected to endure it. The majority opinion also suggested that the conduct was not sufficiently outrageous.

In the next case, *Hassing v. Wortman*, 214 Neb. 154, 333 N.W.2d 765 (1983), plaintiff and defendant had divorced, but the defendant nonetheless began to harass the plaintiff after she became involved with another man, whom she eventually married. He investigated the plaintiff's friend. Defendant drove by plaintiff's house 10 to 15 times a month, once attempted to force plaintiff off the road, and entered plaintiff's house through an unlocked door. He also disseminated information that plaintiff was pregnant when she and defendant married. Defendant also attempted to get the school board to decline to renew plaintiff's teaching contract. The plaintiff consulted a psychiatrist and testified that defendant's actions caused her to worry and lose sleep, that she was nervous and often cried, and that her relationship with her new husband was adversely affected. In reversing a judgment entered pursuant to a verdict for the plaintiff, a majority of this court again suggested that defendant's actions, as a matter of law, were not sufficiently outrageous, and held the evidence did not show the requisite degree of emotional distress. It was considered significant that there was an absence of medical testimony and of evidence that plaintiff's job performance had been adversely affected. We reaffirmed the rule that to recover damages for intentional infliction of emotional distress, the plaintiff must show that the distress was so severe that no reasonable person could be expected to endure it, stating that the proof must show more than mere worry, anxiety, vexation, or anger.

In the most recent prior case, *Mindt v. Shavers*, 214 Neb. 786, 337 N.W.2d 97 (1983), we held a sexual assault to be sufficiently outrageous and extreme conduct, and permitted recovery. The evidence, including expert testimony, established that the plaintiff suffered from a fear of pregnancy and that her relationship with men had deteriorated. She also became

isolated and experienced shame, humiliation, and lowered self-esteem. Her grade-point average in school dropped, and she transferred to another university. She suffered insomnia, weight loss, and a dramatic increase in alcohol and cigarette consumption, and experienced nightmares.

The foregoing cases establish the following to be the elements of a cause of action based upon the intentional infliction of emotional distress: (1) That there has been intentional or reckless conduct; (2) That the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community; and (3) That the conduct caused emotional distress so severe that no reasonable person should be expected to endure it.

In a case dealing with the negligent, as distinguished from the intentional or reckless, infliction of emotional distress, *Fournell v. Usher Pest Control Co.*, 208 Neb. 684, 305 N.W.2d 605 (1981), a majority of the court held that the failure of a pest control company to discover an infestation of termites and the damage caused by them to plaintiffs' house did not constitute a tort because as a matter of law the negligent conduct did not create an unreasonable risk of causing bodily harm. Since *Fournell* concerns negligent conduct, it provides no guidance with respect to the case before us. See Restatement (Second) of Torts §§ 312, 313, 436, and 436A (1965).

The record before us establishes as a matter of law that the requisite elements for recovery do not exist. Any distress which Debby Gall may have suffered was inflicted neither intentionally nor recklessly. Her concern about the lack of insurance coverage to pay her pregnancy and delivery expenses was unfounded. Elizabeth Voyles' conduct may have been insensitive, but she accurately cataloged the consequences which would flow if Carl Gall were able to work and refused to accept the employment available to him. Debby Gall had inserted herself between Great Western and Carl Gall by asking that compensation benefit checks be mailed to her, and by asking that she be called at work if the need arose. Neither was the conduct of Great Western either outrageous in character or extreme in degree. Great Western certainly had a legitimate

interest both on its own behalf and in the ultimate well-being of its employee to determine whether it had work its employee could perform. There is no suggestion that Great Western claimed a legal right it did not possess. One has no liability where he has done no more than insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress. *Hassing v. Wortman*, 214 Neb. 154, 333 N.W.2d 765 (1983), quoting *Paasch v. Brown*, 193 Neb. 368, 227 N.W.2d 402 (1975). Further, the emotional distress suffered by Debby Gall falls short of the requisite degree of severity. As noted in previous cases, there is no occasion for the law to intervene in every case of hurt feelings. *Paasch v. Brown, supra; Davis v. Texaco, Inc.*, 210 Neb. 67, 313 N.W.2d 221 (1981).

Debby Gall cites no authority for her claim that Great Western owed a special duty to deal fairly with her and in good faith. The case upon which she relies, *Olson v. Union Fire Ins. Co.*, 174 Neb. 375, 118 N.W.2d 318 (1962), in fact holds that the insurer had acted neither negligently nor in bad faith in refusing to settle a tort claim against its insured. The duty of the insurer in *Olson* to exercise due care and good faith in the compromise of the claim against its insured arose out of its exclusive contractual right to settle or resist the claim. See *Hadenfeldt v. State Farm Mut. Auto. Ins. Co.*, 195 Neb. 578, 239 N.W.2d 499 (1976). Debby Gall was not an insured of Great Western; in fact, she had no legal relationship with Great Western at all. Any relationship which existed, Debby Gall herself imposed. She points to no basis for finding that Great Western owed her any special duty, and we find none.

Because the record fails to establish the essential elements of the theories of recovery Debby Gall alleged against Great Western, the trial court properly concluded that there exists no genuine issue as to any material fact, that the ultimate inferences to be drawn from those facts are clear, and that Great Western is entitled to judgment as a matter of law.

Since the same allegations were made against Hunt International, and since the same evidence applies and would necessarily lead to dismissal of Debby Gall's action against it, we need not concern ourselves with whether the sustainment of

Hunt International's special appearance was erroneous. For if the sustainment were erroneous, the dismissal is nonetheless correct. A proper result will not be reversed merely because it was reached for the wrong reason. See *Nerud v. Haybuster Mfg.*, 215 Neb. 604, 340 N.W.2d 369 (1983).

AFFIRMED.

KRIVOSHA, C.J., concurring.

Because of the record in this case, I concur in the result reached by the majority opinion. However, in support of its position the majority has cited *Davis v. Texaco, Inc.*, 210 Neb. 67, 313 N.W.2d 221 (1981), and *Hassing v. Wortman*, 214 Neb. 154, 333 N.W.2d 765 (1983). Because of the concurrence authored by Judge White in *Davis* and the dissent, also authored by Judge White, in *Hassing*, with which I concurred in each instance, I do not wish to be misunderstood as having now changed my view as to those two cases. The actions in both *Davis* and *Hassing* were outrageous then and remain so now. The facts in this case simply do not match either *Davis* or *Hassing*.

SHANAHAN, J., dissenting.

There is no question that Carl Gall sustained serious bodily injury and had a valid claim under the Nebraska Workmen's Compensation Act. On February 26 Voyles knew that Dr. Scott, the attending physician, did not authorize Carl Gall's return to work. With that medical information and the additional knowledge about Debby Gall's pregnancy, then in the fourth month, Voyles telephoned Debby on her job at the bank or at home some six times after February 26. Debby's coworkers verified Voyles' telephone calls to Debby at the bank. During telephone contacts, Voyles told Debby that Carl would be fired if he did not return to work and accept a new job with Great Western, although Voyles, a claims adjuster, had no position of authority with Great Western to make such decision or change in Carl's employment. According to Voyles, termination of Carl's employment at Great Western would cause a forfeiture of health insurance coverage and benefits on which Galls were relying to pay maternity medical bills regarding Debby's pregnancy. Existence of health insurance provided by the bank was apparently unknown to Debby when Voyles called,

because, after leaving employment at the bank in May, Debby never applied for benefits under the bank's program, and Debby's supervisor at the bank "took it upon himself" to process a claim on behalf of Debby.

As a result of Voyles' calls, Debby broke out in hives, experienced headaches, became nervous, cried, was unable to carry out her duties at the bank without help from her coworkers, and suffered nervous twitches, primarily in her fingers. According to third parties' affidavits before the court, the calls from Voyles caused Debby to "become extremely upset" even to the point that Debby was "unable to do her work and [was required] to leave her post [at the bank] to use someone's office to try to regain her composure. . . . [H]er hands would quiver." One affiant stated that Debby's emotional state did not "settle down before the next call would come [from Voyles]." Another affiant characterized Debby as "suffering from extreme emotional distress" as a result of Voyles' calls.

Although an insurer, in pursuing its economic interests, may be privileged to assert in a permissible way its legal rights, such assertion must be done in good faith and not in an outrageous manner. See *Fletcher v. Western National Life Ins. Co.*, 10 Cal. App. 3d 376, 89 Cal. Rptr. 78 (1970).

"The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Restatement (Second) of Torts § 46, comment *e*. at 74 (1965). An employee, as a third-party claimant on a policy of workmen's compensation coverage, may bring a cause of action against an employer's insurance company for "outrage" in adjusting the employee's valid claim for workmen's compensation. See *Robertson v. Travelers Insurance Co.*, 100 Ill. App. 3d 845, 427 N.E.2d 302 (1981).

As expressed in *Eckenrode v. Life of American Insurance Company*, 470 F.2d 1, 4 (7th Cir. 1972):

It is recognized that the outrageous character of a person's conduct may arise from an abuse by that person of a position which gives him power to affect the interests

of another; and that in this sense extreme "bullying tactics" and other "high pressure" methods of insurance adjusters seeking to force compromises or settlements may constitute outrageous conduct. . . . It is also recognized that the extreme character of a person's conduct may arise from that person's knowledge that the other is peculiarly susceptible to emotional distress by reason of some physical or mental . condition or peculiarity. [Citing Restatement (Second) of Torts § 46 comment *f*. (1965).]

The record shows Voyles' persistent calls raised the recurring specter of Debby's maternity expenses with Carl unemployed and without family health insurance. Did Voyles intentionally or recklessly cause severe emotional distress to Debby? Did Voyles go beyond the bounds of decency into a sphere of atrocious and intolerable conduct?

Liability for the tort of outrage has been said to exist when, "[g]enerally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " Restatement, *supra*, comment *d*. at 73. Under the circumstances there was a genuine issue of fact for a jury—whether Voyles' activities with Gall were outrageous.

If Voyles' activities were an exercise of a legal right in a permissible way, as indicated by the majority, insurance adjusters have been granted a gilt-edged license to run roughshod over families of claimants having legitimate claims against an insurance company. However, the truly troublesome feature in the present case is adoption of a standard allowing jury determination of "outrage" only in cases of conduct which would cause Attila the Hun to cringe.

GRANT, J., joins in this dissent.