DONOVAN R. PICK AND NANCY C. PICK, APPELLEES, V. FORDYCE CO-OP CREDIT ASSOCIATION, A CORPORATION, AND DONOVAN L. WIESELER, APPELLANTS.

408 N.W.2d 249

Filed June 26, 1987.   No. 85-436.

Thomas E. Brogan of Brogan & Stafford, P.C., for appellants.

William J. Klimisch of Goetz, Hirsch & Klimisch, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

Plaintiffs-appellees, Donovan R. Pick and Nancy C. Pick, husband and wife, brought this action in the district court for Cedar County, Nebraska, against defendants-appellants, Fordyce Co-op Credit Association, a corporation (hereinafter Co-op), and Donovan L. Wieseler, an employee and agent of the Co-op. Plaintiffs' second amended petition alleged that defendants had "willfully and wrongfully removed certain items of personal property together with fixtures" from plaintiffs' building and converted such items to defendants' use. The petition itemized 11 "items of personal property and fixtures." The petition then set out what are denominated six causes of action: (1) for the return of the items; (2) damages for the cost of restoring the items to the condition they were in when taken; (3) damages for the plaintiffs' "wounded feelings, mental suffering, humiliation, degradation, disgrace and physical suffering" resulting from the taking of the items; (4)

damages arising from the fact that plaintiffs were unable to use or rent their real property because of the taking of the items and that plaintiffs had therefore lost rent and cost of electricity; (5) damages to plaintiffs' real property from which the items were removed; and (6) damages for the cost of reinstalling the wrongfully taken fixtures.

Defendants' answer to plaintiffs' second amended petition generally denied plaintiffs' allegations and as affirmative defenses alleged that the Co-op has owned the personal property described in the petition since January 2, 1936, and that plaintiffs had not pled "facts sufficient to show ownership in the personal property, nor an interest in the real estate as to any fixtures attached to the realty . . . ."

The case was tried to a jury on the pleadings set out above. The jury's verdict was on two forms. One ordered the return to plaintiffs of the following items, described as:

> 1 golden oak L shaped bank counter, length over all 22', (1 sec. 14'6" other 7'6") with 2 customers windows with 2 marble dealing plates, 1 door, 6 pull drawers. Below the drawers are 3 double door cabinets and 3 pull drawer cabinets containing several various sized drawers. A swinging door. Inlaid marble pieces approximately 10½" high which were located in the lobby area of the bank building owned by Plaintiffs around the base of the wall and the base of the counter.

By the other verdict form, the jury awarded damages to the plaintiffs in the amount of $8,000. The items ordered to be returned as set out in the verdict form were the only items submitted to the jury to determine if replevin was proper.

Co-op and Wieseler appeal, setting out 10 assignments of error. For the reasons hereinafter set out, we affirm in part, reverse and dismiss in part, and remand on the issue of damages.

On appeal to this court, we will decide the case on the basis on which it was tried. By doing so, we do not necessarily approve of the manner in which the case was presented to the trial court. In the instant case, plaintiffs' petition sets out six "causes of action." An examination of those "causes of action" shows that a cause of action is pled in replevin, with resultant

damages as set out in five "causes of action," which are, in reality, five different items of damages. As the case was tried and submitted to the jury, it appears that two different causes of action were submitted: (1) the replevin action with resulting damages to property and (2) a case for severe emotional distress intentionally or recklessly caused by extreme and outrageous conduct. Plaintiffs, in their brief, state the latter issue was properly submitted, and the jury properly instructed, by the giving of the following instruction:

### INSTRUCTION NO. 11

You are instructed that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and if bodily harm results from it, for such bodily harm. However, the conduct must have been so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. The mental distress for which recovery may be had must be so severe that no reasonable man could be expected to endure it.

Defendants do not specifically complain as to the form of the instruction, but contend the evidence did not support the giving of an instruction as to emotional distress.

With regard to the replevin issue, the primary fact question is whether the items removed by defendants were fixtures or personalty. In the instruction conference defendants attempted to raise the issue as to whether the items in question were trade fixtures. The trial court properly held that this issue had not been raised in the pleadings and would not be submitted to the jury. " ' "Jury instructions should be confined to the issues presented by the pleadings and supported by the evidence. . . ." ' " *Steed v. Oak Ridge Equestrian Ctr.*, 224 Neb. 792, 799, 401 N.W.2d 495, 500 (1987). Plaintiffs' allegations as to personal property items allegedly taken were not submitted to the jury, and there was no cross-appeal on that issue. The other questions to be considered are whether fixtures may be the subject of a replevin action if severed from realty by a wrongdoer and, if damages may be assessed in connection with

such a taking, the nature of the damages.

The record shows the following. On November 27, 1973, the plaintiffs purchased a two-story building in Fordyce, Nebraska. The building contained three living units, and the Co-op was the tenant in part of the space on the first floor on the corner. The Co-op had leased the space in the building since 1935.

The building was originally owned by the Fordyce State Bank and was sold on April 28, 1937, to plaintiffs' predecessor in title by a receiver after the bank apparently went into bankruptcy. The receiver's agreement for sale of real estate attached includes in the list of "Furniture and fixtures" the items which are at issue in this case:

1 Goldon [sic] oak L shaped bank counter,,length over all 22', (1 sec. 14'6" other 7'6") with 2 customers windows with 2 marble dealing plates, 1 door, 6 pull drawers. below the drawers are 3 double door cabinets & 3 pull drawer cabinets containing several various sized drawers.

1 goldon [sic] oak customers wall desk 25 x 60" with glass top.

The district court for Cedar County authorized the sale and ordered the receiver to "deliver a Receiver's Deed to said real estate and a Bill of Sale to said furniture, fixtures and equipment" to plaintiffs' predecessor in title. The abstract on the real estate in question shows that a receiver's deed was issued to plaintiffs' predecessor and shows that plaintiffs are now the owners of said property. The record does not contain the bill of sale referred to.

Plaintiffs did not have a written lease agreement with the Co-op. The parties operated under an oral, month-to-month lease agreement from 1973 until December of 1982 when the Co-op terminated the lease and moved into a new building. At the time of the termination of the lease, the Co-op was paying $200 per month rent and was paying for electricity used.

On November 30, 1982, plaintiff Donovan Pick found that a customer counter and an oak cabinet had been removed from the walls of plaintiffs' building in the space leased by the Co-op. Pick testified that "[i]t was screwed right on to the walls in the corner. It was built-in."

The deputy sheriff of Cedar County who was present at the move on December 4, 1982, testified that the teller counter was attached to the floor with bolts or screws and some nails. Photographs taken of the building after the removal of the property were admitted into evidence. These exhibits indicate that the articles were attached to the floor and walls.

The record further shows that on December 4, 1982, Donovan Pick, who was out working on a service call, was notified by his wife, Nancy, that the Co-op was moving out of the building. Nancy Pick testified that she heard "a tremendous amount of racket on the side of my house which is towards the bank building" and that she rushed to the windows to see what was going on. She testified,

> Then when I saw people in a straight line going across the pavement, you know, walking towards my building from the—which is the new bank building now. Anyway they were wearing insulated unionalls and they had wrecking bars and things in their hands. . . . [M]y little girls were frightened and I didn't know what was going on. . . . [M]y first thought was to protect my home.

Nancy Pick testified further that "[i]t looked like Gun Smoke, walking towards the house." Thereafter, Nancy Pick testified that she called her husband; she called her husband's brother-in-law; she called her parents in California; and she called her brother-in-law in Lincoln. She testified that "I was scared, very scared." Nancy Pick reported that after her husband came, he went to the Co-op for awhile and "we decided that we couldn't do anything about it or anything. . . . Then he went back on his service call."

The record shows that 10 people, which included all of the members of the town board and the 5 members of the Co-op board, in addition to a work crew of other people, were present at the Co-op's move on December 4, 1982. The board members assisted in the move by carrying boxes and records across the street to the new location, and the work crew removed the articles of property claimed by plaintiffs. All were wearing usual working clothes. A deputy sheriff was present to observe the removal of the money and records.

When asked what effect the incident had on her husband,

Nancy Pick testified that "it was very humiliating and belittling." When asked if the experience bothered her, Nancy Pick stated, "Yes, very much. . . . I feel insecure. I don't want to get close or know anybody very well."

Donovan Pick testified that the incident on December 4, 1982, caused him a sleepless night, he became scared, he worried that somebody was going to come back and take something else, and he would not be able to do anything about it. Pick also testified that his wife was more reserved when she was talking to people and doing business with them, that he and his wife used to make decisions a lot faster than they do now, and that the incident has affected his life.

Donovan Pick's brother-in-law, George Kleinschmidt, testified that on December 21 of that year, he went on a 2½-week trip to Florida with the plaintiffs. Kleinschmidt testified that the plaintiffs talked about the December 4 incident every night on the trip and appeared to be upset over it. There was no other evidence as to the emotional distress allegedly suffered by plaintiffs. The elements of a cause of action based upon the intentional infliction of emotional distress are (1) that there has been intentional or reckless conduct, (2) that the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community, and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it. *Gall v. Great Western Sugar Co.*, 219 Neb. 354, 363 N.W.2d 373 (1985).

In the case at bar, the evidence submitted to the jury would support a finding that defendants' acts which were the basis of plaintiffs' claims for emotional distress were intentional. The evidence, however, does not support any determination that defendants' actions were of such a nature as to support a verdict for emotional distress, nor does the evidence support damages for such distress.

The record shows that defendants' actions could not have been a shock or surprise to plaintiffs. Plaintiffs knew at least 7 months before the incidents of December 4, 1982, that the Co-op was erecting a new building, because on May 20, 1982,

plaintiffs had submitted a bid to do the electrical, plumbing, and heating work on the new building for $14,739.42. On April 28, 1982, plaintiffs advertised the space "[p]resently occupied by Fordyce Coop Credit Assn." for rent. Considering the population of Fordyce was 148, plaintiffs, as a matter of law, had to have been informed of such events, and knew a move was forthcoming.

On November 30, 1982, Donovan Pick knew defendants were removing items from the building, preparing for the move. It was necessarily apparent to plaintiffs that defendants were removing items which had been used by the Co-op since 1935, and which apparently the defendants claimed belonged to the Co-op.

We have construed conduct far worse than that of defendants in this case as not being "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Gall v. Great Western Sugar Co.,* *supra* at 358, 363 N.W.2d at 377.

In *Davis v. Texaco, Inc.*, 210 Neb. 67, 313 N.W.2d 221 (1981), after plaintiff had been splashed with hot radiator fluid, the defendant's service station attendant did not respond to plaintiff's request for a covering after she had removed her blouse on account of her burns. The attendant finally gave plaintiff a filthy fender cover to cover her partial nakedness. While attempting to leave the premises to secure medical attention, during which time plaintiff was upset, hysterical, and in pain, plaintiff found the attendant had removed an engine part and would not restore it until she returned the fender cover. Plaintiff was left partially clad on a major thoroughfare in Omaha, Nebraska, and forced to bargain for a used shirt to wear. In affirming the trial court's refusal to submit the cause to the jury, we held that plaintiff's embarrassment and humiliation in being so treated did not rise to the level of distress required, that is, distress so severe that no reasonable person could be expected to endure it.

In *Hassing v. Wortman*, 214 Neb. 154, 333 N.W.2d 765 (1983), the plaintiff was harassed by her ex-husband, who drove by her house repeatedly and for a continued period of

time, who was seen crawling in the bushes outside her home, and who entered her home uninvited. The defendant sent numerous letters to plaintiff's family, neighbors, and employer revealing embarrassing information about the plaintiff and her new boyfriend, whom she later married. The plaintiff sought psychiatric help and hired a security guard for her wedding out of fear of her ex-husband. This court determined that defendant's conduct, described as childish, irresponsible, and inconsiderate, did not amount to extreme and outrageous conduct. The trial court's award of damages to plaintiff for emotional distress was reversed, and we held that plaintiff's fright, embarrassment, and worry did not amount to emotional distress so severe that no reasonable person should be expected to endure it.

The record shows that the circumstances of the Co-op's move from plaintiffs' building were not particularly unusual or out of the ordinary. There were a number of people present for the move, but it was for the purpose of making the new Co-op operational the next Monday, and many of them had to be known to plaintiffs. None wore unusual clothing, and there was no evidence of any threatening behavior, albeit they removed property claimed by the plaintiffs.

The conduct of the officers and employees of the Co-op during the December 4, 1982, incident does not rise to the level of the extreme and outrageous conduct which is essential for conduct to be actionable for intentional infliction of emotional distress.

It must be noted, also, that the damages alleged to be suffered by plaintiffs were not, as a matter of law, "so severe that no reasonable person should be expected to endure it." Although Nancy Pick testified that she was frightened by the unexpected noise and the number of people involved in the Co-op's move, since then she has been more reserved, and Donovan Pick suffered a sleepless night, humiliation, and fears that someone else would take his property, there is no evidence of extreme mental distress. This court had held that there is no occasion for the law to intervene in every case of hurt feelings. *Gall v. Great Western Sugar Co.*, 219 Neb. 354, 363 N.W.2d 373 (1985), citing *Paasch v. Brown*, 193 Neb. 368, 227 N.W.2d 402

(1975), and *Davis v. Texaco, Inc., supra.*

The record fails to establish the essential elements of the intentional infliction of emotional distress and fails to establish "severe" damage. We conclude that, as a matter of law, there was not sufficient evidence to submit the issue of emotional distress to the jury.

We cannot tell from the general jury verdict awarding $8,000 in damages whether damages for emotional distress were included in this award. For this reason we reverse as to the damages award and remand for a redetermination of the plaintiffs' damages in connection with the replevin issue only.

With regard to the issue of replevin, we must first determine whether the articles for which plaintiffs seek return are fixtures. This court set out the definition of a fixture in *Fuel Exploration, Inc. v. Novotny*, 221 Neb. 17, 22-23, 374 N.W.2d 838, 842 (1985), as follows:

> The term "fixture" refers to a chattel which is capable of existing separate and apart from realty . . . but which, by actual annexation and appropriation to the use or purpose of the realty with the intention of making it a permanent accession thereto, becomes a part of the realty.
>
> . . .
>
> . . . .
>
> . . . The intention of the party making the annexation is to be inferred from the nature of the articles affixed, the relation between the parties, the situation of the party making the annexation, . . . and the purpose or use for which the annexation has been made.

An instruction was submitted to the jury which sets out the guidelines for determining when an article becomes a fixture and therefore becomes a part of the realty. By virtue of the verdict in plaintiffs' favor, it must be assumed the jury found the articles to be fixtures. The evidence supports that determination.

The record shows that the articles claimed by plaintiffs were in the building when it originally operated as the Fordyce State Bank. The teller counter was bolted or screwed to the subfloor, with ceramic tile floor imbedded in cement poured up to the side of the counter. The teller counter was also set against the

subwall, and the wall was plastered up around the counter. There was testimony that the swinging door and customer counter were screwed or bolted to the walls. The original owner of these articles installed them in the building for the purpose of operating a bank. It can be inferred from the manner in which the articles were affixed to the realty that the original owner, the predecessor in title to plaintiffs, intended the articles to be permanently affixed.

We next address whether a fixture which is severed from the premises by a wrongdoer can be the subject of a replevin action. Generally, an action of replevin is one for recovery only of personal property and cannot be maintained to recover real property. 66 Am. Jur. 2d *Replevin* § 9 (1973). However, upon the wrongful severance of a fixture, the object becomes the personal property of the owner of the realty and may be recovered as personalty in an action of replevin. 35 Am. Jur. 2d *Fixtures* § 28 (1967). Although the severance of fixtures changes their legal character from realty to personalty, it does not change their ownership, and in case of wrongful severance, the owners of the fee can reclaim the fixtures or recover damages, at least. *Houle v. Guilbeault*, 70 R.I. 421, 40 A.2d 438 (1944).

Causes of action for conversion and replevin of property severed from realty do not involve real property, since the severance of fixtures and improvements from land change the character of the property from real to personal, irrespective of the means by which it is accomplished. *Peiser v. Mettler*, 50 Cal. 2d 594, 328 P.2d 953 (1958).

Where a fixture annexed to a freehold is tortiously severed, the owner of the realty, at his option, may treat the fixture as personalty and recover the same by the action of replevin. *Peiser v. Mettler, supra*, citing *Teater v. Good Hope Dev. Corp.*, 14 Cal. 2d 196, 93 P.2d 112 (1939). See, also, *Schulenberg v. Harriman*, 88 U.S. 44, 22 L. Ed. 551 (21 Wall. 1874) (timber is realty, but when severed from land becomes personalty; owner entitled to replevin action and to all remedies for wrongful removal or conversion of personal property); *Lieberman v. Clark*, 114 Tenn. 117, 85 S.W. 258 (1904) (owners of timber cut by another entitled to replevin action to recover).

The record shows that plaintiffs were the record owners of real property to which the articles were affixed. Defendants did not rebut this evidence with any proof of ownership of the articles. The jury verdict which found "for the Plaintiffs for the return of the . . . items" is by implication a finding that plaintiffs were the owners of the property. Defendants' removal of the fixtures belonging to plaintiffs entitles plaintiffs to a replevin action for the recovery of the items.

The measure of damages in a replevin action where the property is not returned is the value of the property, together with interest, from the date of the unlawful taking. *Wellman v. Birkel*, 220 Neb. 1, 367 N.W.2d 716 (1985). When property is returned in a replevin action, the party recovering possession of the property is entitled to recover as damages any deterioration or depreciation in the value which has taken place during the wrongful detention. *Wellman v. Birkel, supra*.

Plaintiffs are also entitled to recover damages if the evidence establishes the cost to repair and reinstall the fixtures removed by defendants.

We find that the damages alleged for the loss of rent and cost of electricity are not proper measures of damages in this case. The record shows that the Co-op did not have a written lease with plaintiffs and therefore, after proper termination, had no obligation for rent or utility costs. In view of this disposition of the case, the other assignments will not be discussed.

AFFIRMED IN PART, REVERSED AND DISMISSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.