# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3746

_____

| | | |
|---|---|---|
| James Costello; Jamie Costello, Individually and as next friends and parents of Sadonya Costello, minor child, | * * * * * | |
| Appellants, | * * | |
| v. | * * | Appeal from the United States District Court for the |
| Mitchell Public School District 79; Board of Education of Mitchell Public Schools; Roger Kercher, individually and in his official capacity; Kent Hally, individually and in his official capacity; Donald Wagner, individually and in his official capacity, | * * * * * * * | District of Nebraska. |
| Appellees. | * * | |

_____

Submitted: June 13, 2001

Filed: September 24, 2001

_____

Before WOLLMAN, Chief Judge, BOWMAN, and HAMILTON,[1] Circuit Judges.

_____

[1]The Honorable Clyde H. Hamilton, United States Circuit Judge for the Fourth Circuit, sitting by designation.

WOLLMAN, Chief Judge.

James and Jamie Costello (the Costellos), and their daughter Sadonya Costello (Sadonya) (collectively, the plaintiffs), appeal from the district court's grant of summary judgment in favor of Mitchell Public School District 79, the school board and superintendent of Mitchell Public Schools, the principal of Mitchell High School (Mitchell or the school), and a teacher at Mitchell (collectively, defendants). We affirm.

**I.**

In this appeal from the grant of a summary judgment motion, we recite the facts in the light most favorable to the plaintiffs. We begin with a brief note on terminology. According to the lexicon of special education services, an SAT is a student assistance team, which evaluates students, attempts to assist teachers in providing general education, and may refer a child to a multidisciplinary team (MDT) for further evaluation. An MDT is responsible for determining if a child has a verified disability under the regulations and for developing and implementing an individual education plan to ensure that child receives an appropriate education.

During her first four years at Morrill Elementary School in Morrill, Nebraska, Sadonya received special education services. By fifth grade, however, she was not verified as having a disability sufficient to qualify her for the provision of special education services under Nebraska's regulations, see Neb. Admin. R. & Regs. tit. 92, ch. 51, § 006.04A. In May of 1994, for example, a report issued by her MDT indicated that Sadonya had no disability. In May of 1996, however, after Sadonya's sixth-grade year, another MDT report concluded that Sadonya was disabled by an "other health impairment" and that she should have more testing. This determination, however, was not supported by a written report of a physician detailing her current

health status and its implications, a requirement under Nebraska law. See Neb. Admin. R. & Regs. tit. 92, ch. 51, § 006.04I3a.

In the summer of 1996, the Costellos completed the appropriate paperwork to have Sadonya and her older brother attend Mitchell High School, where Sadonya accordingly matriculated for seventh grade during the 1996-1997 school year. Her educational records were transferred from Morrill to Mitchell.

At the beginning of the fall 1996 semester, principal Kent Halley, guidance counselor Joe Yauney, and special education teacher Carey Brown met to discuss Sadonya's medical records and concluded that she was not eligible for special education services because her disability had not been verified under Nebraska law. Brown testified that this was an SAT meeting. Sadonya was informally monitored, however, and during the first semester Mitchell's staff saw no indication that Sadonya would need special education services. Both Halley and Brown observed that Sadonya's grades were generally average, that she was very social, and that she seemed to be well accepted by her peers. Her grades dropped somewhat during the second quarter of that semester, however, and by the end she was failing band class.

Several weeks into the semester the Costellos became aware of the fact that Sadonya was not receiving special education services when Sadonya reported that she was not receiving occupational therapy. During the next few months, and particularly in the spring of 1997, many contacts occurred between the Costellos and Mitchell High School's administrators and staff regarding Sadonya's status. The Costellos signed a release so that Sadonya's doctors could send information on her health to the school. The diagnoses and evaluations the school received, however, were outdated and did not explain Sadonya's current status. For example, several letters stated that Sadonya had previously been diagnosed with epileptic seizures, attention deficit disorder, and unspecified learning disabilities, but did not give her current status and

abilities. One report did indicate, however, that Sadonya was currently taking phenobarbitol.

At the end of her first semester at Mitchell, Sadonya was having difficulty with her band teacher, Roger Kercher. She testified in her deposition that he daily called her "retarded," "stupid," and "dumb," in front of her classmates. In one instance, after belittling her in front of the class for a bad grade on an assignment in her notebook, he threw the notebook at her, hitting her in the face. During a basketball game in either late December or early January at which the band was playing, Sadonya came to her mother and explained that Kercher had just told her that she could no longer play in the band because she was too stupid and that he did not have to teach students like her and that he would not. Jamie Costello asked Kercher about it, who just laughed and said "yeah, something like that."

Jamie Costello subsequently met with Halley, Yauney, Kercher, and Sadonya's therapist about the problems with band, although Kercher became angry and left the meeting. During the meeting, Jamie Costello asked Sadonya's therapist what she thought about Sadonya remaining in band class, and "she said if Mr. Kercher feels that way, [Sadonya's] not going to gain anything by being in one of his classes." Sadonya was then removed from band and placed in a required music appreciation class, which was also taught by Kercher. Sadonya completed the music appreciation class despite Kercher's comments. Several other students and parents mentioned to Jamie Costello that Kercher had also been verbally, and occasionally physically, abusive toward other students in his classes.

Early in the second semester, principal Halley convened an SAT meeting with Sadonya and various staff members, including Yauney and Sadonya's social studies teacher, to discuss ways to improve Sadonya's academic situation. Sadonya subsequently signed a contract with Mitchell that required her to ask for more help from teachers when she needed it. Sadonya's grades continued to drop during the

spring, however, and the Costellos were sent several notices in January, March, and May about her failing grades. Sadonya also was less social and had more absences than during the prior semester. Mitchell's staff members sent letters on behalf of the school seeking additional information from various health professionals about Sadonya's current impairments and contacted the Costellos about the need for more medical information. In the absence of such information, Sadonya's case stalled and she received no formal special education services.

In May of 1997, Dr. Mark R. Scanlan, a psychiatrist, wrote a letter to Mitchell, concluding that if Sadonya "returns to school at this point her situation would only worsen, both physically and mentally." Sadonya has been home-schooled since that time. She has suffered from depression and suicidal thoughts and receives counseling and treatment.

Sadonya and her parents filed suit in the district court, bringing three 42 U.S.C. § 1983 claims, two for violations of the Due Process and Equal Protection Clauses of the United States Constitution and one for violations of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1487, the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and the Rehabilitation Act, 29 U.S.C. § 794. They also brought separate claims under the IDEA, ADA, and Rehabilitation Act and a state-law claim of intentional infliction of emotional distress. All claims were brought against Mitchell School District 79 and the Board of Education of Mitchell Public Schools, as well as against Kercher, Halley, and district superintendent Donald Wagner, individually and in their official capacities.

On November 22, 1999, the district court[2] granted partial summary judgment against the Costellos and Sadonya, holding that the individual defendants were entitled

[2]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

to qualified immunity and dismissing on the merits the intentional infliction of emotional distress claim. On September 14, 2000, the court[3] granted summary judgment in favor of the remaining defendants. The Costellos and Sadonya appeal.

## II.

We review the district court's grant of summary judgment de novo. Henerey v. City of St. Charles, 200 F.3d 1128, 1131 (8th Cir. 1999). Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Id.; Fed. R. Civ. P. 56(c).

### A.  Due Process Clause

The Costellos and Sadonya argue that they have a liberty interest in Sadonya's education and that the school district's acquiescence in Kercher's harassment constituted a violation of substantive due process. They also allege a procedural due process violation, arguing that the defendants were required to provide special education services to Sadonya.

Assuming the existence of a protected liberty interest, we turn first to the procedural due process issue. The record shows that Sadonya's disability was not verified. Her records at Morrill Elementary show her as a student with a disability consisting of an "other health impairment," but they lack the required written report detailing her current health status. See Neb. Admin. R. & Regs. tit. 92, ch. 51, § 006.04I3a. Accordingly, Mitchell informed the Costellos that more information was needed. Mitchell subsequently followed appropriate procedures to determine

_____

[3]The Honorable David L. Piester, United States Magistrate Judge for the District of Nebraska, presiding by consent of the parties pursuant to 28 U.S.C. § 636(c).

Sadonya's entitlement to special educational services. An SAT monitored Sadonya, considered all facets of her adjustment to Mitchell, and concluded independently that she did not qualify for special education services. Accordingly, we conclude that the plaintiffs have failed to create a genuine issue of material fact on a procedural due process violation.

We also conclude that the plaintiffs' substantive due process claim, based on Kercher's verbal harassment of Sadonya, fails. To establish a substantive due process claim, the plaintiffs must show that the "government's actions either shock the conscience or offend judicial notions of fairness or human dignity." Young v. City of St. Charles, 244 F.3d 623, 628 (8th Cir. 2001) (internal quotation marks omitted). Although Kercher's behavior, as alleged by the plaintiffs, strikes us as being singularly unprofessional, we conclude that the plaintiffs have not raised a genuine issue of material fact on whether his behavior was sufficiently shocking to the conscience to state a substantive due process claim. See Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992); cf. Abeyta v. Chama Valley Indep. Sch. Dist., 77 F.3d 1253, 1258 (10th Cir. 1996) (teacher repeatedly calling student a prostitute and turning a deaf ear while her classmates did so held not to constitute a substantive due process violation).

## B. Equal Protection

Plaintiffs acknowledge that a disability like retardation is "not 'a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation.'" Heidemann v. Rother, 84 F.3d 1021, 1031 (8th Cir. 1996) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 442 (1985)). A plaintiff may bring an equal protection claim as a "class of one" where she alleges "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam).

-7-

The plaintiffs argue that Sadonya's removal from band class violated her equal protection rights. We conclude that the plaintiffs have not raised a genuine issue of material fact on whether removing Sadonya from the band was rationally related to a legitimate governmental purpose--namely, providing Sadonya with a public education that is conducive to learning. Although removal from band may not have been the only option available to Mitchell, we conclude that there is no issue of material fact about whether this determination was rationally related to a legitimate governmental purpose. See Heidemann, 84 F.3d at 1031 (finding no equal protection violation where restraint technique was not "beyond the scope of professionally acceptable choices").

## C. The IDEA

The IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free. Florence Cty. Sch. Dist. 4 v. Carter, 510 U.S. 7, 13 (1993); 20 U.S.C. § 1400(d)(1)(A). Under the IDEA, a child with a disability is defined as having one of certain enumerated conditions, which includes "other health impairments." 20 U.S.C. § 1401(3)(A)(i). Under Nebraska law, a diagnosis of "other health impairment" must include the analysis and documentation of such an impairment in a "signed, written report from a physician which describes the current health status and gives any medical implications of the impairment." Neb. Admin. R. & Regs. tit. 92, ch. 51, § 006.04I3a. The parents of a child who has a disability within the meaning of the IDEA are entitled to written prior notice whenever the local educational agency proposes or refuses to initiate or change "the identification, evaluation, or educational placement of the child." 20 U.S.C. § 1415(b)(3).

In granting summary judgment in favor of the defendants on the IDEA claim, the district court found that the Costellos and Sadonya had failed to raise a genuine issue of material fact on whether Sadonya had a verified disability. The plaintiffs argue that Mitchell violated the IDEA because Sadonya did not receive special education services

despite a verified disability and because they did not receive proper notice that Sadonya's services would be discontinued when she entered Mitchell.

Although Morrill Elementary treated Sadonya as having a verified "other health impairment," her records from that school lacked the necessary physician's report on Sadonya's current health impairments. Mitchell was required under the appropriate regulations to determine if Sadonya was qualified for special education services at her current level of functioning, not her past levels. See Neb. Admin. R. & Regs. tit 92, ch 51, § 006.04I3 (1992). Accordingly, Mitchell properly did not consider Sadonya as a child with a disability within the meaning of the IDEA.

Turning to the procedural issue, the IDEA requires parental notice whenever an educational "agency proposes to initiate or change or refuses to initiate or change the identification, evaluation, or educational placement of the child." 20 U.S.C. § 1415(b)(3). The IDEA does not refer to "verified" disabilities. That term occurs only in Nebraska's administrative code.[4] The IDEA contemplates that the parents of a child in any stage of the verification process receive prior written notice of all initiations or refusals of action by the agency. Mitchell identified and evaluated Sadonya, but it refused to institute an educational placement that included special education services. This is a refusal within the meaning of the IDEA. Thus, Sadonya's parents should have received the written notice required by § 1415(c), which details the specific information an educational agency must include in the notice.

Not all procedural errors result in a loss of educational opportunity. See J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 (2d Cir. 2000); Heather S. v. Wisconsin, 125 F.3d 1045, 1059 (7th Cir. 1997) (quoting W.G. v. Bd. of Trustees, 960 F.2d 1479,

---

[4]Section .006.04A states: "School districts, county superintendents, or approved cooperatives shall provide special education services only to children with verified disabilities."

1483 (9th Cir. 1992)).  Despite the failure to provide the notice required by § 1415, Mitchell requested, both orally and in writing, a current medical report.  In response to these requests, the plaintiffs provided only outdated diagnoses that did not describe any current health impairment.  In light of their failure to provide information that might well have helped Mitchell in its continuing efforts to evaluate Sadonya's condition, the plaintiffs will not now be heard to complain of Mitchell's failure to comply literally with the terms of the relevant statutes.  Accordingly, we conclude that the court properly granted summary judgment to the defendants on the IDEA claim.

## D.  The ADA and Rehabilitation Act

The plaintiffs argue that Sadonya was disabled within the meaning of the ADA because she has a disability, was regarded as disabled, or has a record of disability, and  that the defendants therefore violated the ADA and Rehabilitation Act by denying her the benefits of participating in band class.  See 42 U.S.C. § 12132 ("no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity"); see also 29 U.S.C. § 794(a).[5]

Under the ADA, disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).  "[W]hether a person has a disability under the ADA is an individualized inquiry."  Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999).

---

[5]The parties argue both claims primarily under the ADA standards, so for the purposes of this appeal, we do likewise.  See Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998) (ADA similar to Rehabilitation Act so that cases interpreting either are applicable and interchangeable).

An impairment is "substantially limiting" if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an individual can perform such an activity compared to the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii) (2001). Major life activities include learning. 29 C.F.R. § 1630.2(i) (2001).

Sadonya and her parents point to her past impairment diagnoses to support a claim of actual disability. They present no evidence, however, of a physical or mental impairment that substantially limits Sadonya in the life activity of learning. The evidence demonstrates that it is more difficult for her to learn than for her peers, but that this limitation has not prevented Sadonya from advancing to the next grade each year or from currently working toward her G.E.D. The evidence points to the conclusion that whatever Sadonya's impairments may be, they are only moderately limiting. Indeed, in the beginning of seventh grade, before band class became intolerable, Sadonya's grades were average, and later in the year, educational professionals still believed that Sadonya would be able to keep up with her class so long as she asked for and received some additional help. The plaintiffs have therefore not shown that Sadonya's impairment causes a substantial limitation when compared to the general population. See Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 598 (8th Cir. 1998) (difficulties in life that do not hinder performance of required tasks not substantial limitation); Weber v. Strippit, Inc., 186 F.3d 907, 914 (8th Cir. 1999) (describing moderate limitation as insufficient), cert. denied, 120 S. Ct. 794 (2000). Accordingly, Sadonya has not shown that she is actually disabled within the meaning of the ADA.

We turn then to the plaintiffs' assertions that Sadonya was regarded as disabled by the defendants. To be regarded as disabled under the ADA, an individual must show that she has an impairment that "does not substantially limit major life activities but is treated by a covered entity as constituting such limitation." 29 C.F.R. §

1630.2(*l*)(1); see <u>Cody v. CIGNA Healthcare, Inc.</u>, 139 F.3d 598-99 (8th Cir. 1998). The evidence shows that the defendants treated Sadonya as if she was student without a substantially limiting impairment. Indeed, the main thrust of the plaintiff's IDEA claims is that Mitchell did not treat Sadonya as disabled when it should have. Kercher's name-calling alone is insufficient to raise a genuine issue of material fact on the matter.

Finally, we address plaintiffs' contention that Sadonya had a record of disability. To establish the existence of a record of a disability, an individual must show that she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). As previously mentioned, Sadonya's records do not show a substantially limiting impairment, and thus she has not raised a genuine issue of fact on her claim that she has a record of a disability.

We conclude that there exists no genuine issue of material fact on the issue of whether Sadonya was disabled within the meaning of the ADA and Rehabilitation Act, and summary judgment was therefore properly granted in favor of all defendants on this claim.

### E. Intentional Infliction of Emotional Distress

With regard to the intentional infliction of emotional distress claim, the district court concluded that the Costellos and Sadonya had failed to present a genuine issue of material fact under Nebraska law on whether Kercher's actions were so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency.

To constitute intentional infliction of emotional distress, a plaintiff must show

-12-

(1) [t]hat there has been intentional or reckless conduct; (2) [t]hat the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community; and (3) [t]hat the conduct caused emotional distress so severe that no reasonable person should be expected to endure it.

Gall v. Great W. Sugar Co., 363 N.W.2d 373, 377 (Neb. 1985). Assuming that the plaintiffs have raised a genuine issue of material fact on the first and third parts of the test, we agree with the district court that Kercher's words and conduct, however unprofessional, intemperate, and unworthy of one entrusted with the responsibility of educating students, did not rise to the level that would satisfy part two of the test set forth in Gall. Accordingly, the district court did not err in granting summary judgment in favor of all defendants on the merits of this claim.

The judgment is affirmed.

HAMILTON, Circuit Judge, concurring in part and dissenting in part:

I concur in all of the court's opinion but the part that affirms the district court's grant of summary judgment in favor of Roger Kercher (Kercher) with respect to Sadonya Costello's (Sadonya) claim alleging intentional infliction of emotional distress under Nebraska common law. With respect to this claim, the court rejects it, concluding that, while "unprofessional, intemperate, and unworthy of one entrusted with the responsibility of educating students," ante at 13, Kercher's conduct was not so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is not to be regarded as atrocious and utterly intolerable in a civilized community. The court's decision on this claim is not only unfortunate for Sadonya and our Nation's public schools, but, more importantly, it is not grounded upon a reasonable interpretation of the record in this case. Accordingly, because I would vacate the district court's grant of summary judgment in favor of Kercher with

-13-

respect to Sadonya's claim of intentional infliction of emotional distress under Nebraska common law and remand for further proceedings, I dissent in part.

I

To fully appreciate the unquestionably deplorable nature of Kercher's conduct, a recitation of the relevant facts is necessary.

On August 2, 1996, Sadonya celebrated her thirteenth birthday. Approximately one month later, Sadonya began attending the seventh grade at Mitchell High School, a school completely new to her. Sadonya initially enrolled in band class, taught by Kercher, wherein she played the clarinet. Kercher knew that Sadonya was a new student at Mitchell High School because she had introduced herself to Kercher as such during her tour of Mitchell High School prior to the start of the school year.

For Sadonya, her seventh grade year began reasonably well. She earned passing grades for the first half of the first semester, was very social, and seemed to be well accepted by her peers. By the beginning of the second half of the first semester, however, Sadonya began to have performance problems in all her classes. With respect to band class, Sadonya asked Kercher for after-school help on a regular basis. For a while he complied with her requests without complaint. Then, every day for approximately one month prior to Christmas vacation, Kercher told Sadonya in front of her fellow band classmates that she was retarded, stupid, and needed to go to a school where retarded people were taught. Kercher almost always made these humiliating statements in response to Sadonya's continued requests for after-school help with her clarinet.

On one occasion, Kercher snapped at Sadonya in response to a request for after-school help: "If you're so retarded, you don't need to be in this classroom." (J.A. 329). Furthermore, during this same time period, Kercher threw Sadonya's band notebook (that he had just been grading) at her while calling her "stupid" and declaring

-14-

that if she "could not do any better than that, then he didn't want somebody like [her] in his class." (J.A. 330). The notebook hit Sadonya in the face. This notebook incident also took place in front of Sadonya's fellow band classmates.

Kercher's crass behavior toward Sadonya resumed after Christmas vacation. For example, during a school basketball game at which the school band performed, Kercher told Sadonya that he was going to kick her out of the band because she was "too stupid." (J.A. 347). Moreover, Kercher's statements referring to Sadonya as stupid and retarded in front of her classmates continued on a frequent basis during the entire nine weeks that Sadonya was enrolled in Kercher's music appreciation class, which began in late January 1997, despite the fact that Kercher learned on January 22, 1997 that Sadonya had recently begun mental health counseling.

Over the course of time, Kercher's cruel behavior toward Sadonya caused her extreme emotional distress. On January 27, 1997, Sadonya reported to her treating psychiatrist, Dr. Mark Scanlan, M.D. (Dr. Scanlan), that she had particular problems at school with her band teacher being mean towards her, and as a result, she had been more moody and tearful. Dr. Scanlan reported that Sadonya felt quite stressed by the school situation. He diagnosed her with major depression.[6]

On April 2, 1997, Dr. Scanlan examined Sadonya again. His notes reflect that she continued to have trouble with teachers, particularly Kercher. His notes from this visit further state: "She states she tends to rush though her work and is otherwise distracted and anxious about school problems. She also appears somewhat more depressed lately with decreased mood, [and] variable sleep pattern." (J.A. 173).

---

[6]Following a psychiatric examination by Dr. Scanlan of Sadonya on December 19, 1996, Dr. Scanlan reported in his notes that although issues of depression suffered by Sadonya needed to be addressed with an individual therapist, he ruled out major depression at that time.

Again, he diagnosed her with major depression and ordered her to continue individual mental health counseling.

By early May 1997, Sadonya's mental and emotional state had reached an all time low with her becoming suicidal. Thus, on May 7, 1997, Dr. Scanlan again examined Sadonya and diagnosed her with major depression. His notes reflect he felt that Sadonya withdrawing from the remainder of the school year at Mitchell High School was "important for her overall improvement" and Sadonya's treatment at school "was certainly a cause of her recent decompensation." (J.A. 170). On the same day, Dr. Scanlan sent a letter to Mitchell High School stating that if Sadonya "returns to school at this point her situation would only worsen, both physically and mentally." (J.A. 145).

II

To recover for intentional infliction of emotional distress under Nebraska common law, Sadonya must prove the following elements by a preponderance of the evidence: "(1) that there has been intentional or reckless conduct, (2) that the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community, and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it." Brandon v. County of Richardson, 624 N.W.2d 604, 620-21 (Neb. 2001). The evidence in the present case, when viewed in the light most favorable to Sadonya, is sufficient for a reasonable jury to find in her favor with respect to each of these elements, and thus, the district court's grant of summary judgment in favor of Kercher was, in my opinion, reversible error.

A reasonable jury could infer that Kercher intended to inflict emotional distress on Sadonya from the nature of his statements to her under all the facts and circumstances of this case. In determining whether a defendant's conduct meets the second element of an intentional infliction of emotional distress claim, the extreme and

-16-

outrageous element, all of the facts and circumstances of the particular case must be considered.  Id. at 621.  For example, the relationship between the parties is an important factor to be considered because the extreme and outrageous character of the defendant's conduct may arise from the defendant's abuse of a position of power or trust, or a relation with the plaintiff, which gives the defendant actual or apparent authority over the plaintiff, or power to affect the plaintiff's interests.  Id.; Restatement (Second) of Torts (Restatement) § 46 cmt. e (1965).  Another important factor to be considered in determining whether a defendant's conduct meets the extreme and outrageous element is whether the defendant knew the plaintiff was particularly susceptible or vulnerable to emotional distress.  Brandon, 624 N.W.2d at 621; Restatement § 46 cmt. f. "[C]onduct which might otherwise be considered merely rude or abusive may be deemed outrageous when the defendant knows that the plaintiff is particularly susceptible to emotional distress."  Brandon, 624 N.W.2d at 621. Generally, the extreme and outrageous element is met when recitation of the facts to an average member of the community would arouse his resentment against the defendant, and lead such member "to exclaim, 'Outrageous!'" Restatement § 46 cmt. d.

There is no doubt that recitation of the facts in the present case, as set forth above, to an average member of the Nebraska community would arouse resentment against Kercher and lead such member of the community to exclaim "Outrageous!" In his capacity as Sadonya's teacher, Kercher intentionally attempted to publicly humiliate Sadonya, a child, on the topic of the inadequacy of her intelligence, knowing that she would be particularly susceptible to resulting emotional distress given her young age, the fact that she was a new student at Mitchell High School, and that she was already doing poorly in his class.  Additionally, as of January 22, 1997, Kercher knew that Sadonya required the services of a mental health counselor.  Under these facts, I cannot say, as a matter of law, that Kercher's conduct was not so outrageous as to exceed the bounds of decent society.  Cf. Baird v. Rose, 192 F.3d 462 (4th Cir. 1999) (holding that plaintiff stated cause of action under Virginia common law for

intentional infliction of emotional distress against her seventh grade show choir teacher where plaintiff alleged that the teacher, in her capacity as the plaintiff's teacher, intentionally attempted to humiliate the plaintiff in front of her classmates, knowing that plaintiff was suffering from clinical depression). Sadonya has met the second element of her intentional infliction of emotional distress claim against Kercher. Brandon, 624 N.W.2d at 620-21.

Sadonya has also met her burden of proffering sufficient evidence to survive summary judgment with respect to the last element of her intentional infliction of emotional distress claim--that Kercher's conduct caused Sadonya emotional distress so severe that no reasonable person should be expected to endure it. Id. That Sadonya suffered extreme emotional distress, including major depression and thoughts of suicide, as the result of Kercher's conduct is well documented in Sadonya's medical records. Indeed, Kercher's conduct left Sadonya in such a fragile emotional state that she was not able to finish out the short remaining period in the school year.

III

In sum, I concur in the court's opinion except that I would allow Sadonya's intentional infliction of emotional distress claim against Kercher to go to a jury. If all of Sadonya's allegations about Kercher's conduct are true, society would immeasurably benefit from the imposition of civil liability upon such conduct.

A true copy.

Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.