NORTHERN NATURAL GAS COMPANY AND ENRON LIQUIDS PIPELINE COMPANY, APPELLANTS, v. STATE BOARD OF EQUALIZATION AND ASSESSMENT, APPELLEE.

443 N.W.2d 249

Filed July 14, 1989.   No. 88-706.

John K. Boyer, Norman H. Wright, and Amy S. Bones, of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellants.

Robert M. Spire, Attorney General, and L. Jay Bartel for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

This is an appeal by Northern Natural Gas Company and Enron Liquids Pipeline Company (hereinafter collectively referred to as Enron) from a decision of the Nebraska State Board of Equalization and Assessment (the Board) with respect to a request made by Enron for equalization of centrally assessed property.

Enron appealed directly to this court pursuant to Neb. Rev. Stat. § 77-510 (Cum. Supp. 1988), which provides in part: "From any final decision of the State Board of Equalization and Assessment with respect to the valuation of any real or personal property, any person, county, or municipality affected thereby may prosecute an appeal to the Supreme Court."

Since appeal was not taken pursuant to Neb. Rev. Stat. § 84-918 (Reissue 1987) of the Administrative Procedure Act, this court's standard of review is not de novo on the record. This court has decided that when the Administrative Procedure Act is inapplicable because another method of appeal has been prescribed, the standard of review will be to search only for

errors appearing in the record; i.e., whether the decision conforms to law, is supported by competent and relevant evidence, and was not arbitrary, capricious, or unreasonable. *In re Application A-15738*, 226 Neb. 146, 410 N.W.2d 101 (1987) (direct appeal to the Supreme Court from the Department of Water Resources); *Banner County v. State Bd. of Equal.*, 226 Neb. 236, 411 N.W.2d 35 (1987).

The disputes involved in this appeal arose in part as a result of three cases which were decided by the U.S. District Court for the District of Nebraska: *Trailer Train Co. et al. v. Leuenberger*, No. CV87-L-29 (D. Neb. Dec. 11, 1987), *aff'd* No. 88-1118 (8th Cir. Dec. 19, 1988), *cert. denied, Boehm v. Trailer Train Co. et al.*, ____ U.S. ____, 109 S. Ct. 2065, 104 L. Ed. 2d 630 (1989); *Burlington Northern RR. Co. et al. v. Leuenberger*, No. CV87-L-565 (D. Neb. Dec. 10, 1987); and *Oklahoma Gas & Electric Co. et al. v. Leuenberger*, No. CV88-L-52 (D. Neb. Jan. 26, 1988).

The plaintiffs in *Trailer Train* were car companies that furnish railcars to railroads. Their only relationship to Nebraska stems from the fact that their railcars are located or operated in Nebraska by the railroads. The federal district court held that the assessment of the plaintiffs' personal property and the imposition, levy, or collection of any personal property taxes against the plaintiffs pursuant to Neb. Rev. Stat. §§ 77-624 et seq. (Reissue 1986) violates § 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4-R Act), and permanently enjoined the imposition, levy, and collection of any personal property taxes from the plaintiffs. On appeal, the U.S. Court of Appeals for the Eighth Circuit affirmed, ruling that the levy and collection of Nebraska's ad valorem tax on car company property violated the 4-R Act.

The plaintiffs in *Burlington Northern RR. Co.* were several of the railroads that do business in Nebraska. The federal district court preliminarily enjoined and restrained the collection of ad valorem property tax payments for tax year 1987 on that portion of plaintiffs' operating property that consists of personal property. The court issued the preliminary injunction after finding reasonable cause to believe that the

personal property tax levied on the plaintiffs results in discriminatory treatment of common carriers by railroad, in violation of § 306(1)(d) of the 4-R Act.

The plaintiffs in *Oklahoma Gas & Electric Co.* were carlines doing business in Nebraska. The federal district court enjoined distribution of the Nebraska carline tax for the 1987 tax year, finding reasonable cause to believe that the tax violates § 306 of the 4-R Act.

The result in each case was reached through application of the 4-R Act, a federal statute. To prevent the unreasonable burdening of interstate commerce that results from discriminatory state and local taxation of rail carrier property, Congress enacted the 4-R Act, Pub. L. No. 94-210, 90 Stat. 54, § 306 (codified at 49 U.S.C. § 26c (1976); recodified at 49 U.S.C. § 11503 (1982) in accordance with the revised Interstate Commerce Act of 1978).

At issue in *Trailer Train* was whether Nebraska's personal property taxation system, which provides for extensive exemptions from personal property tax under Neb. Rev. Stat. § 77-202 (Supp. 1987), violates § 306(1)(d) of the 4-R Act, which prohibits the imposition of any tax which results in discriminatory treatment of a common carrier by railroad. The federal district court found that the Nebraska system of taxation did violate the federal statute. According to the court,

> Under the Nebraska scheme, the majority of the personal property in the state is statutorily exempted from taxation, while a minority of personal property, including all the property that belongs to Trailer Train in the state, is subject to an <u>ad valorem</u> tax on its actual value. . . . [T]he Nebraska system favors a majority of the property of possible taxpayers by exempting that property from taxation but denies the property of rail car lines the same favorable treatment.

*Trailer Train, supra,* slip op. at 6. The court further found that the actual result of Nebraska's taxation scheme is an unfair and discriminatory tax burden on the railroads.

In light of the federal district court's rulings in the three cases discussed above, Enron submitted a request with the Board asking that its unit values be equalized with the railroads and

car companies doing business in Nebraska, i.e., that the portion of the unit value that is comprised of personal property be disregarded in determining the amount of property tax it owes to the state. In conjunction with this request, Enron also sought a determination that its pipelines constitute personal property.

Enron is a public service entity within the meaning of Neb. Rev. Stat. § 77-801 (Reissue 1986). Northern Natural Gas, a division of Enron Corporation, owns, maintains, and operates a gas pipeline system in Nebraska. Enron Liquids, a subsidiary of Enron Corporation, owns, maintains, and operates a liquid hydrocarbon pipeline in Nebraska. Enron's property is centrally assessed by the state for property tax purposes through the Tax Commissioner rather than county assessors, pursuant to Neb. Rev. Stat. § 77-802 (Cum. Supp. 1988).

To establish the value of a centrally assessed taxpayer, the Department of Revenue uses a methodology known as "unit value." Rather than valuing individual items of property owned by such a taxpayer, the department values the property of the taxpayer as a total unit. Dennis Donner, the central assessment manager of the Department of Revenue, explained the unit value method at the Board's August 2, 1988, hearing:

> These values are derived by use of the unit value concept, which is a valuation of the company as a going concern, as opposed to just a simple summary of the assets of the company. The Department uses the traditional three approaches to value, that being the market[,] income and cost approach in developing these values, and then it correlates the results into an indication of value for the company. This value is then allocated to the state of Nebraska, based on varying factors, depending on which particular industry we're referring to.

Once the department has calculated the unit value of the centrally assessed taxpayer and determined what portion of that value should be taxed by Nebraska, the Tax Commissioner apportions the total taxable value to all taxing subdivisions in which property of the taxpayer is located and certifies to the county assessors the value so determined. § 77-802.

During the August 2, 1988, hearing, the Board dismissed Enron's request for equalization with the railroads and car

companies doing business in Nebraska. Additionally, the Board decided to equalize Enron's property, and all other centrally assessed property, through application of a statewide "aggregate level of assessment" determined by the Department of Revenue to be 88.7 percent of actual value. The department first calculated the average ratio of assessed value to actual value for all classes of tangible property: residential (improved and unimproved), commercial and industrial (improved and unimproved), agricultural (improved and unimproved), personal, and centrally assessed. Then the department aggregated the average ratios to arrive at the 88.7 percent figure.

At the Board's August 2, 1988, hearing, Enron objected to being equalized with the statewide "aggregate level of assessment" of 88.7 percent of value. In dismissing the matter, the Board stated in its order:

> [T]he uncontraverted [sic] evidence shows that all property valued by the state, including the property of Enron, is at 100 percent of value; that said property is equalized to the same level of value as all property valued by the state that being the aggregate level of value for all tangible property in this state; and, that the State Board has properly fulfilled its duty to equalize all the tangible property in the state.

Enron argues before this court that its property should be assessed at 73.7 percent of actual value, the aggregate level at which unimproved agricultural land is being valued in this state.

Since the perfection of this appeal, on December 19, 1988, an opinion was filed in the U.S. Court of Appeals for the Eighth Circuit which affirmed the decision of the U.S. District Court in *Trailer Train Co. et al. v. Leuenberger*, No. CV87-L-29 (D. Neb. Dec. 11, 1988). That court said in part:

> In [*Burlington Northern R. Co. v. Bair*, 584 F. Supp. 1229 (S.D. Iowa 1984)] the other centrally assessed taxpayers were still subject to the personal property tax as are the taxpayers here who are not in agriculturally related businesses. The railroad in that case received the same "preferential tax treatment" that Trailer Train is accorded here. This is because the other taxpayers are not protected

by § 306(1)(d). When three-fourths of the commercial and industrial personal property in the state is not taxed because personal property used in agriculturally-related business is exempt, railroads are discriminated against if their personal property is taxed. The appropriate remedy, as awarded by the trial court, is to enjoin the collection of the discriminating tax, even though other taxpayers do not receive the same benefits.

*Trailer Train Co. et al. v. Leuenberger*, No. 88-1118, slip. op. at 7 (8th Cir. Dec. 19, 1988). Following argument of the case in this court, the Supreme Court of the United States issued an order on May 15, 1989, denying the petition for certiorari filed by the Tax Commissioner of Nebraska. Therefore, the Board's argument throughout its brief that the judgment of the U.S. District Court is not binding in this instance is no longer valid.

Enron assigns as error: (1) The Board erred in dismissing its request for equalization; (2) the Board erred in failing to find Enron's pipelines to be personal property and to equalize that portion of its correlated unit value with railroads and car companies doing business in Nebraska; (3) the Board erred in adopting and applying a "blended" or "aggregate" equalization ratio, composed of an average of the levels at which all various types of property are valued; and (4) the Board erred in failing to equalize Enron's property with unimproved agricultural land.

Basically, Enron made two requests of the Board. First, it contended that its property should be equalized with the property of the railroads and car companies operating in Nebraska, which were also assessed on a unitary basis. In other words, the final judgment of the federal court enjoined the State of Nebraska from assessing the personal property of railroads and car companies, and Enron insists that it not be taxed on that portion of its unit value that represents personal property. In that connection, it further argues that its pipelines are personal property and should not be assessed. Secondly, Enron did not want the Board to equalize its other property with the aggregate level of assessment for all property in the state, including centrally assessed property such as Enron's which is assessed at 100 percent of actual value.

The Board argues that it lacks authority and jurisdiction to consider and act on the issues raised by Enron in the first instance, and therefore this court acquired no jurisdiction to consider the issues on appeal. In other words, the issues raise questions of law, including constitutional issues, and the Board insists that it has no authority to consider those issues.

Neb. Rev. Stat. § 77-505 (Cum. Supp. 1988) requires the Board to review the abstracts of assessments of property submitted by the county assessors and to equalize such valuations for tax purposes within the state. More pertinent to this case, § 77-802 requires the Tax Commissioner to determine the total taxable value of a public service entity like Enron for each of the local assessing districts. The action of the Tax Commissioner, of course, is appealable to the Board. This court has stated the Board has a wide latitude of judgment and discretion in equalizing assessment of property. *City of Omaha v. State Board of Equalization & Assessment*, 181 Neb. 734, 150 N.W.2d 888 (1967). The Board acts in a quasi-judicial capacity when equalizing property. *Box Butte County v. State Board of Equalization & Assessment*, 206 Neb. 696, 295 N.W.2d 670 (1980). County boards of equalization are required to make the initial determination as to whether certain locally assessed property is exempt from taxation, which involves a mixed question of fact and law. See, e.g., *Ev. Luth. Soc. v. Buffalo Cty. Bd. of Equal.*, 230 Neb. 135, 430 N.W.2d 502 (1988); *Bethphage Com. Servs. v. County Board*, 221 Neb. 886, 381 N.W.2d 166 (1986).

Implicit in the determination of tax exemption, as pointed out in *Bethphage*, was the application of the facts to § 77-202(1)(c), which provides that exempt from taxation is property "owned by . . . religious, charitable . . . organizations and used exclusively for . . . charitable . . . purposes . . . ." Certainly this involves a mixed question of fact and law and involves the quasi-judicial power of the board of equalization.

In the instant case, there is a difference between Enron being able to *request* equalization with the railroads and car companies and Enron being *entitled* to be equalized with the railroads and car companies. It is common sense that Enron cannot be equalized with those companies unless it makes a

request. It also seems clear that to make such a request, Enron must start with the Board, the only entity with statutory authority to equalize the valuations of centrally assessed taxpayers. As previously stated, our review on an appeal such as this is for error appearing in the record, but we review questions of law de novo on the record.

We therefore hold that in an application before the Board, a taxpayer may employ any factual or legal argument in support of his, her, or its position requesting equalization, subject to the final determination of questions of law on a de novo basis by this court on appeal.

Article VIII, § 1, of the Nebraska Constitution provides in relevant part that except for motor vehicles, "[t]axes shall be levied by valuation uniformly and proportionately upon all tangible property . . . ." It would seem that no question exists that if the Board arbitrarily undervalues a particular class of property so as to make another class of property disproportionately higher, or achieves the same result because of legislative action, this court must correct that constitutional inequity by lowering the complaining taxpayer's valuation to such an extent so as to equalize it with other property in the state. See, *Kearney Convention Center v. Board of Equal.*, 216 Neb. 292, 344 N.W.2d 620 (1984); *Banner County v. State Bd. of Equal.*, 226 Neb. 236, 411 N.W.2d 35 (1987). This being the case, no logical reason exists why the same requirement of valuation reduction should not be imposed when the disproportionality is brought about by a final judgment of the federal court exempting the personal property of the railroads and car companies from the imposition of a state tax.

The state, by not taxing the personal property of railroads and car companies, although acting involuntarily and under compulsion of federal law, nevertheless, by complying with that mandate, has denied Enron equal protection of the law contrary to the 14th amendment to the U.S. Constitution.

In *Sioux City Bridge v. Dakota County*, 260 U.S. 441, 43 S. Ct. 190, 67 L. Ed. 340 (1923), the county taxed the bridge company's property at actual value while other property in the county was assessed at only 55 percent of its value. The bridge company alleged this practice violated the equal protection

clause of the 14th amendment to the U.S. Constitution.

Citing *Sunday Lake Iron Co. v. Wakefield*, 247 U.S. 350, 38 S. Ct. 495, 62 L. Ed. 1154 (1918), the Court stated:

> "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property."

(Citations omitted.) *Sioux City Bridge, supra*, 260 U.S. at 445. The Court held that the taxing of the bridge company's property at 100 percent of its actual value while other property is taxed at 55 percent of its actual value violates the equal protection clause of the 14th amendment.

The Court also held that

> the right of the taxpayer whose property alone is taxed at 100 per cent of its true value is to have his assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the requirement of statute. The conclusion is based on the principle that where it is impossible to secure both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of law.

260 U.S. at 446.

As we have previously stated, it makes no difference if the undervaluation of the property of the railroad and car companies comes about because of deliberate action by the Board, legislative enactment, or the final and binding judgment of the federal courts. The conclusion remains the same: The equal protection clause of the 14th amendment mandates that the same result be reached with respect to the personal property of Enron as that in the case of the railroad and car companies.

It therefore becomes necessary to determine whether the pipelines of Enron are personal property and thus exempt from

taxation under the doctrine of *Trailer Train Co., et al. v. Leuenberger*, No. CV87-L-29 (D. Neb. Dec. 11, 1987), *aff'd* No. 88-1118 (8th Cir. Dec. 19, 1988), *cert. denied, Boehm v. Trailer Train Co. et al.*, _____ U.S. _____, 109 S. Ct. 2065, 104 L. Ed. 2d 630 (1989).

Neb. Rev. Stat. § 77-103 (Reissue 1986) provides:

> The terms real property, real estate and lands shall include city and village lots and all other lands, and all buildings, fixtures, improvements, cabin trailers or mobile homes which shall have been permanently attached to the real estate upon which they are situated, mines, minerals, quarries, mineral springs and wells, oil and gas wells, overriding royalty interests and production payments with respect to oil or gas leases, units of beneficial interest in trusts, the corpus of which includes any of the foregoing, and privileges pertaining thereto.

Personal property includes all property other than real property and franchises. Neb. Rev. Stat. § 77-104 (Reissue 1986). The issue therefore is whether pipelines are fixtures, and thus real property, or are personal property.

Section 77-103 does not provide a definition for fixtures. However, this court in *State ex rel. Meyer v. Peters*, 191 Neb. 330, 215 N.W.2d 520 (1974), stated that the common-law rules relating to fixtures are largely codified in § 77-103.

To determine whether an item constitutes a fixture, this court looks at three factors: (1) actual annexation to the realty, or something appurtenant thereto, (2) appropriation to the use or purpose of that part of the realty with which it is connected, and (3) the intention of the party making the annexation to make the article a permanent accession to the freehold. *Bank of Valley v. U.S. Nat. Bank*, 215 Neb. 912, 341 N.W.2d 592 (1983); *T-V Transmission v. County Bd. of Equal.*, 215 Neb. 363, 338 N.W.2d 752 (1983).

The third factor, the intention to make the article a permanent accession to the freehold, is generally regarded as the most important factor when determining whether an article is a fixture. The other two factors, annexation and appropriation to the use of the realty, have value primarily as evidence of such intention. See generally *Bank of Valley v. U.S.*

*Nat. Bank, supra.* The intention of the party making the annexation can be inferred from the nature of the articles affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made. *Bank of Valley v. U.S. Nat. Bank, supra*; *Pick v. Fordyce Co-op Credit Assn.*, 225 Neb. 714, 408 N.W.2d 248 (1987); *Fuel Exploration, Inc. v. Novotny*, 221 Neb. 17, 374 N.W.2d 838 (1985).

In this case, the pipelines are buried in the ground. In *Sulphur Springs Val. Elec. Coop. v. City of Tombstone*, 1 Ariz. App. 268, 401 P.2d 753 (1965), *aff'd* 99 Ariz. 110, 407 P.2d 76, the Arizona court had to address whether the pipes, poles, and wires that were the chief components of a utility distribution system were fixtures and therefore real property that had to be sold at public auction. To determine whether an article is a fixture, the Arizona courts consider the same three factors this court considers.

The pipes were buried in the ground. The court noted that there was no evidence of an agreement between the city and owners of the fee that the chattels were to become accessions to the realty. The court held that because there was no proof of the adaptability to the use for which the real estate was appropriated and no proof of an intent by the annexor that the attachment of the chattels be permanent, despite annexation to the realty, the utility equipment had not lost its character as personal property.

In considering the issue of annexation when determining whether an article is a fixture, some courts have looked at whether removal of the article will injure the realty or will injure the article itself. Enron quotes at length from one such case.

In Stem Brothers, Inc. v. Alexandria Township, 6 N.J. Tax 537 (1984), the question was whether certain underground storage tanks were fixtures or personal property. In this case, the court focused upon the injury by removal test, and stated: "These [the five underground storage tanks] could be lifted from the subject property intact just as could be done with the 20,000 gallon above-ground tanks and no damage at all would occur to

the tanks. The only preparatory work that would need to be done before the tanks could be lifted onto a truck would be removal of the soil covering them. The excavation that would result from uncovering one of the 20,000 gallon tanks would be large. Each such tank is ten feet in diameter and 30 feet long so that the excavation would have to be somewhat longer, wider, and deeper than those dimensions. Despite this size, however, such an excavation could not in any reasonable sense be said to constitute 'irreparable' physical damage to the land because the hole could easily be refilled. As a result, the land would be virtually the same in all respects as it had been before. The sole question, then, is whether the excavation would constitute 'serious' physical damage to the land within the meaning of the phrase 'material injury' as used in the Business Personal Property Tax Act . . .

. . . .

"Some of the factors which might have to be considered in determining whether 'serious physical damage' had occurred to unimproved land are: (a) any change in the market value of the land as a result of the condition; (b) the amount of time and the cost required to repair the condition; and (c) the hazard or dislocation caused by the condition.

"I find that no 'serious physical damage' would be caused to plaintiff's land by an excavation to remove the underground storage tanks and to restore plaintiff's unpaved parking yard to its original state. There is no indication that the value of the land would be affected by such an excavation. The entire process of removing a tank and restoring the ground to its original state would require only two days and would create no serious hazard or dislocation. Finally, the cost to excavate and refill the hole would be relatively insignificant.

"I therefore conclude that all nine of plaintiff's fuel oil storage tanks were business personal property for the tax year 1981 and that the tanks should not have been assessed by the taxing district for local property tax purposes. 6 N.J. Tax at 543."

Brief for appellants at 26-27.

Earl Berdine, an Enron employee, testified in his deposition that very little damage generally results to the pipe when it is removed and that the only damage to the land is "a temporary inconvenience while the work is actually going on and then after the work is completed the land is restored, put back into its original use."

The second factor, appropriation to the use or purpose of that part of the realty with which the article is connected, focuses on the relationship between the article and the use which is made of the realty to which the article is attached. If the chattel is a necessary or useful adjunct to the realty, then it may be said to have been appropriated to the use or purpose of the realty to which it was affixed. If the chattel is attached for a use which does not enhance the value of the land, it is generally deemed not to become a part of the land. See 1 G. Thompson, Commentaries on the Modern Law of Real Property § 56 (1980).

The pipeline companies in *Yellowstone Pipe Line Co. v. St. Bd. Equal.,* 138 Mont. 603, 358 P.2d 55 (1960), *cert. denied* 366 U.S. 917, 81 S. Ct. 1095, 6 L. Ed. 2d 241 (1961), were attempting to establish that their pipelines were real estate. The pipelines were imbedded in real estate rights-of-way obtained from the owners of the fee by written conveyance. The State Board of Equalization argued that the pipelines did not improve the real estate, served no purpose on the land, did not enhance the value of the real estate, and could be removed at any time by the company.

Under Montana case law, if property was placed on land to improve it or make it more valuable, it was generally deemed a fixture, but if it was attached for a use which did not enhance the value of the land, it remained a chattel. Considering the established rules regarding fixtures, the *Yellowstone Pipe Line Co.* court stated:

> The line could as easily lie on top of the ground were it not for the maintenance problem brought on by its exposed position and the difficulty of crossing natural and man-made obstructions. Does the pipe line improve the land and make it more valuable? To the contrary the land

makes the pipe line more valuable since it removes it from danger of damage were it exposed. To what purpose is the pipe line put? It is used for the transportation of petroleum products and, in our opinion, such use bears no relationship whatever to the use of the realty. There can exist here no presumption that respondents intended the pipe to become part of the realty because the evidence is conclusive that they had no such intention.

*Id.* at 630-31, 358 P.2d at 69. The court concluded that the pipeline is not a fixture.

As Enron points out in this case, it has the right to remove its pipeline and does so on occasion. According to Enron, and we agree, the pipeline is not adapted to the use to which the ground in which it is embedded is applied. Most of the ground is agricultural land, and while the pipe is in place, a farmer or rancher may continue to conduct his normal operations. The pipeline does not improve the land nor make it more valuable. The ground is only a foundation upon which the pipes can rest. Use of the pipeline bears no relationship to the use of the realty, the pipeline being buried in order in part to minimize maintenance.

Finally, was the intention of Enron to make the article a permanent accession to the freehold?

In a number of cases, the courts have considered the fact that the annexor had an easement as establishing an intent that the article remain personal property. In *Southwestern Public Service Co. v. Chaves County*, 85 N.M. 313, 512 P.2d 73 (1973), the court had to decide whether certain equipment located on easements, including poles and transmission lines, was real estate. The court noted that if Southwestern intended the equipment installed on unowned land to become part of the realty, Southwestern would, under general law, be parting with title to the equipment. The court concluded that there was no evidence, of either a subjective or objective nature, indicating Southwestern had any such intention. To the same effect, see, *Sulphur Springs Val. Elec. Coop. v. City of Tombstone*, 1 Ariz. App. 268, 401 P.2d 753 (1965); *Liberty Lk. Sewer v. Liberty Lk. Utils.*, 37 Wash. App. 809, 683 P.2d 1117 (1984); *In re Mobilife Corp.*, 167 So. 2d 336 (Fla. 1964).

The evidence here was that Enron's normal method of operation is to obtain easements for purposes of laying its pipelines. Its pipeline is generally located on rights-of-way rather than land Enron owns in fee. Enron never intended, as we view the record, to part with the title to its pipelines by conducting its operation in this manner. Furthermore, the evidence discloses that Enron retains possession of the pipes for purposes of repair, replacement, and recycling if necessary.

The Board cites only one case in which the court held that the gas pipeline of a gas transmission company was not personal property but, rather, was real property for tax purposes. *Transco. Corp. v. Prince William Co.*, 210 Va. 550, 172 S.E.2d 757 (1970). That court agreed that the chief test to be considered in determining whether the chattel has been converted into a fixture is the intention of the party making the annexation. We agree, but conclude that in the instant case, the intention of Enron was not to convert its annexations into fixtures. Consequently, we find the pipelines to be personal property.

Finally, because the unitary value of Enron may include some real property, it is necessary that we determine whether that portion of its valuation should be based on an aggregate or blended ratio, or on the average ratio of unimproved agricultural land.

In *Kearney Convention Center v. Board of Equal.*, 216 Neb. 292, 344 N.W.2d 620 (1984), we held that the uniformity clause of the Nebraska Constitution required that the complaining taxpayer's land had to be valued at 44 percent, the lowest ratio of assessed valuation to actual valuation. We had concluded that although the taxing authorities may classify different types of property for taxation purposes, nevertheless, the results reached by such different methods and reasonable classifications must be correlated so that the valuations reached shall be uniform and proportionate. The record in this case does not support such a favorable finding for the Board.

Although article VIII, § 1, of the Nebraska Constitution was amended in 1984 in an attempt to permit the valuation of agricultural land by a different method, this court concluded that the result must be correlated with the value of all other land. At the risk of being redundant, we state that such a result

has not been reached in this case.

The Board has asked us to reconsider our decision in *Banner County v. State Board of Equal.*, 226 Neb. 236, 411 N.W.2d 35 (1987). There is nothing to reconsider. Neb. Const. art. VIII, § 1, providing that "[t]axes shall be levied by valuation *uniformly and proportionately*" (emphasis supplied), to say nothing of the 14th amendment to the U.S. Constitution, which directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws," both remain viable and in full force and effect. *Banner County* could be written in no other way.

The order of the State Board of Equalization and Assessment is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.