# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 01-2026/01-2028/01-2029

_____

| | |
|---|---|
| In re: MBA Poultry, L.L.C., | * |
| | * |
| Debtor. | * |
| _____ | * |
| | * |
| Dapec, Inc., | * |
| | * |
| Appellant, | * |
| | *   Appeals from the United States |
| v. | *   District Court for the |
| | *   District of Nebraska. |
| Small Business Administration, U.S., | * |
| | * |
| Defendant/Appellee, | * |
| | * |
| City of Tecumseh, | * |
| | * |
| Interested Party, | * |
| | * |
| The Money Store; Bird Watchers, | * |
| L.L.C., | * |
| | * |
| Interested Parties/Appellees. | * |

_____

No. 01-2480

_____

| | |
|---|---|
| In re: MBA Poultry, L.L.C., | * |
| | * |
| Debtor. | * |
| _____ | * |
| | * |
| Dapec, Inc., | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Small Business Administration, U.S., | * |
| | * |
| Defendant, | * |
| | * |
| City of Tecumseh, | * |
| | * |
| Interested Party/Appellant, | * |
| | * |
| The Money Store; Bird Watchers, | * |
| L.L.C., | * |
| | * |
| Interested Parties/Appellees. | * |

_____

Submitted:  February 15, 2002

Filed:  May 30, 2002
_____

Before McMILLIAN and RILEY, Circuit Judges, and KORNMANN,[1] District Judge.
_____

_____

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota, sitting by designation.

RILEY, Circuit Judge.

These appeals arise out of the Chapter 11 bankruptcy of MBA Poultry, Inc. (MBA Poultry). At the time it declared bankruptcy, MBA Poultry owed debts to The Money Store (Money Store), the United States Small Business Administration (SBA), Dapec, Inc. (Dapec), and the City of Tecumseh, Nebraska (Tecumseh), as well as to other creditors who are not parties to these appeals. The Money Store and the SBA claim interests in advances made under two loan agreements, Dapec claims an interest in construction materials it furnished to MBA Poultry, and Tecumseh is trying to collect unpaid sewer and water bills. On appeal, we must determine whether the bankruptcy court was correct in determining the relative priorities of the claims of these parties. We affirm in part and reverse in part.

I.    BACKGROUND

The debtor, MBA Poultry, is the former owner of a chicken processing plant in Tecumseh, Nebraska. When MBA Poultry purchased the plant from the Campbell Soup Company on June 16, 1998, it obtained financing from the Money Store. The Money Store made two loans to MBA Poultry on the date of the purchase. The first loan (the "A" loan) was a promissory note in the amount of $840,000, payable over a period of thirty years. The second loan (the "B" loan) was a promissory note for $973,000, payable over a period of one year.

The "A" loan and the "B" loan were each secured by a separate deed of trust filed in Johnson County, Nebraska, on June 17, 1998. In addition, as authorized by Nebraska's statutes on construction liens, a "notice of commencement" of renovations to the plant was also filed in Johnson County on June 17, 1998. See Neb. Rev. Stat. § 52-145. The notice of commencement was filed a few minutes after the Money Store recorded its trust deeds.

The Money Store began disbursing money under the two loans the day the promissory notes were signed. On June 16, 1998, the Money Store disbursed $382,556 of the "A" loan and $642,515 of the "B" loan. The balances of both loans were dispensed in installments, beginning on July 1, 1998, and ending on December 11, 1998.

MBA Poultry obtained additional financing from Heller Financial, Inc. (Heller). Heller's loan and security interest were executed on October 29, 1998, more than two months after Heller filed a financing statement with the Johnson County Clerk. Heller's financing statement covered, among other things, all of MBA Poultry's personal property, "whether now owned or existing or hereafter acquired or arising." From the appellate record, it is unclear how much Heller loaned MBA Poultry. When the bankruptcy petition was filed, MBA Poultry owed Heller $2,149,948.

MBA Poultry's business did not generate enough revenue to pay off the "B" loan in the one-year repayment period. Instead, MBA Poultry paid off the "B" loan by arranging a $1,000,000 loan from the Nebraska Economic Development Corporation (NEDCO). The NEDCO loan was secured by a deed of trust filed in Johnson County on December 16, 1998. MBA Poultry's president and CEO, Mark Haskins, also gave a personal guarantee for the loan. In January 1998, NEDCO provided the money to repay the "B" loan by issuing debentures guaranteed by the SBA. As part of this transaction, the Money Store assigned the "B" loan and the trust deed securing it to the SBA.[2]

---

[2]In September 1998, the Money Store entered into an agreement with Dapec, subordinating its security interest to Dapec's interest in the goods and fixtures sold by Dapec to MBA Poultry. Dapec did not file the subordination agreement until February 5, 1999, after MBA Poultry had assigned its interest to the SBA. Dapec does not rely on the subordination agreement in its dispute with the SBA.

Shortly after purchasing the plant, MBA Poultry began renovations by installing an "air-chill" system. MBA Poultry bought the air-chill system from Dapec for $709,000. On August 31, 1998, MBA Poultry gave Dapec a security interest in "all goods and fixtures" it purchased from Dapec, including "renewals, additions, or replacements thereto." Dapec claims it later provided additional materials worth $12,000. Dapec did not file financing statements reflecting its security interest until November 1998. On November 9, Dapec recorded a financing statement with the Nebraska Secretary of State. On November 13, Dapec recorded a financing statement in Johnson County. Both financing statements referred to "all goods or fixtures" which MBA Poultry purchased from Dapec. Dapec filed a construction lien for $721,000 plus interest on January 22, 1999.

MBA Poultry filed for Chapter 11 bankruptcy on January 25, 2000. On February 17, 2000, the bankruptcy court entered a final order giving Heller a super-priority interest in MBA Poultry's personal property and authorizing the sale of the "DAPEC Air Chill Line." Heller assigned its claim in bankruptcy to Bird Watchers, L.L.C., which then purchased all of MBA Poultry's real and personal property at auction for $4,800,000. The sale was approved by the bankruptcy court on June 7, 2000.

After the sale was approved, the bankruptcy court had to determine priority among MBA Poultry's creditors. With the exception of Dapec, the creditors agreed on priority in the following order: (1) Johnson County, (2) City of Tecumseh, (3) the Money Store, and (4) American National Bank. These creditors also agreed that either Dapec or the SBA should occupy the fifth priority position.

Dapec refused to join the agreement on priority. Instead, it claimed that its construction lien has priority, to some extent, over the liens of the Money Store and the SBA. Dapec raised two arguments in support of this claim. First, it argued that its construction lien dates back to June 17, 1998, when the notice of commencement

was filed, and that it trumps any advances made after that date. Second, Dapec argued that the frame of the air-chill line – a stainless steel "superstructure" – is a fixture, and that its perfected security interest in the superstructure trumps the security interest held by the SBA.

The bankruptcy court rejected both of these arguments, finding that Dapec's construction lien did not attach before the Money Store made its cash advances and that the superstructure is not a fixture. The bankruptcy court then entered an order allowing the bankruptcy proceeds to be distributed in accordance with its rulings on these two issues. The district court affirmed all three of these decisions, but did not reach the merits of the fixture issue. Instead, the district court held that Dapec waived its fixture claim by failing to object to the bankruptcy court's February 17, 2000 final order.

The bankruptcy court also had to settle an issue of priority between Dapec and the City of Tecumseh. On January 19, 2000, Tecumseh certified MBA Poultry's delinquent sewer and water bills to the Johnson County Clerk. On January 25, 2000, when it declared bankruptcy, MBA Poultry owed Tecumseh $32,796.06 for sewer service and $31,028.57 for water service. The bankruptcy court held these unpaid bills were special assessments which automatically took priority over Dapec's construction lien.

The district court reversed the bankruptcy court's decision on this issue, holding that Tecumseh was not entitled to treat its sewer and water liens like special assessments with automatic priority over Dapec's construction lien. The district court remanded the case to bankruptcy court for a determination of whether Tecumseh's liens have priority if they are not treated like special assessments.

Dapec and Tecumseh now appeal the decisions of the district court. In its appeals, Dapec asserts that its construction lien and its security interest in the

superstructure have priority over the deeds of trust held by the Money Store and the SBA. Tecumseh, in its appeal, asserts that MBA Poultry's sewer and water bills are special assessments with automatic priority over Dapec's claims.

## II.    DISCUSSION

In a bankruptcy appeal, this court sits as a second court of review and applies the same standards of review as the district court. In re Cedar Shore Resort, Inc., 235 F.3d 375, 379 (8th Cir. 2000). Like the district court, we review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Id.

### A.    Priority Under Nebraska's Construction Lien Statutes

The first issue on appeal pits Dapec's construction lien against the deeds of trust the Money Store took to secure the "A" loan and the "B" loan. The deed of trust for the "A" loan is still held by the Money Store, while the deed of trust for the "B" loan has been assigned to the SBA.

Under Nebraska law, as a general rule, "a construction lien has priority over subsequent advances made under a prior recorded security interest if the subsequent advances are made with knowledge that the lien has attached." Neb. Rev. Stat. § 52-139(2). In order to obtain priority under this statute, Dapec must show that the Money Store made its cash advances with knowledge that Dapec's construction lien had attached. The bankruptcy court found that the Money Store did not know about Dapec's construction lien until after December 11, 1998, when it finished making future advances under the "A" and "B" loans.

In an attempt to overcome this finding, Dapec relies on the "notice of commencement" filed on June 17, 1998. Under Nebraska law, "[i]f a lien is recorded while a notice of commencement is effective as to the improvement in connection with which the lien arises, the lien attaches as of the time the notice is recorded." Neb. Rev. Stat. § 52-137(2). Dapec argues that since section 52-137(2) relates its lien

back to June 17, 1998, when the notice of commencement was recorded, it also imputes knowledge of the lien to the Money Store as of that date.

Dapec's argument fails because the relevant statute – section 52-139(2) – requires actual knowledge of a competing lien.  "In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning."  Rodriguez v. Monfort, Inc., 635 N.W.2d 439, 445 (Neb. 2001).  Under section 52-139(2), the priority of a construction lien does not turn on imputed knowledge that a lien has attached or the knowledge that a lien might attach.  It turns, rather, on the lender's "knowledge that the lien has attached."  See Neb. Rev. Stat. § 52-139(2).  In its ordinary use, the term "knowledge" means being "cognizant, conscious, or aware of something," Webster's Third New International Dictionary 1252 (1993), and we see no reason why the Nebraska Legislature would have intended a different meaning here.  As explained above, the Money Store did not actually know about Dapec's construction lien when it was making advances.  Accordingly, under the construction lien statutes, Dapec's construction lien is subordinate to the deeds of trust filed by the Money Store.[3]

## B.    The Fixture Issue

Under certain circumstances, Nebraska law gives a perfected security interest in a fixture priority over the conflicting interest of an encumbrancer of the related real estate.  See Neb. U.C.C. § 9-313(4) [Operative until July 1, 2001].[4]  A fixture is a chattel which is capable of existing separate and apart from a parcel of real property,

---

[3]Dapec also claims its liens might have priority under a Nebraska statute on mortgages.  See Neb. Rev. Stat. § 76-238.01.  However, Dapec waived this argument by failing to raise it in the bankruptcy court.  We therefore decline to address it.

[4]In 1999, the Nebraska Legislature adopted a revised version of Article 9 of the Uniform Commercial Code, with an operative date of July 1, 2001.  1999 Neb. Laws ch. 550.  The relevant events in this case all took place before that date.

but which has become a more or less permanent part of the real estate.  See Pick v. Fordyce Coop. Credit Ass'n, 408 N.W.2d 248, 255 (Neb. 1987) (citation omitted).  Dapec argues that its security interest in the stainless steel superstructure has priority over the trust deed held by the SBA because the superstructure is a fixture.[5]

The district court did not reach the merits of this argument, finding instead that Dapec waived the argument by failing to object to the bankruptcy court's February 17, 2000 final order.  Interpretation of the bankruptcy court's order presents a question of law which we review de novo.  See Brady v. McAllister, 101 F.3d 1165, 1168 (6th Cir. 1996).  The final order of February 17, 2000, created a super-priority interest in certain personal property, including MBA Poultry's "overhead conveyor."  However, it is not obvious to us that the bankruptcy court meant the term "overhead conveyor" to include the superstructure.  In the purchase orders for the air-chill system, MBA Poultry and Dapec distinguished the components of the conveyor from the superstructure.  Perhaps more important, the bankruptcy court apparently did not believe that Dapec had waived the issue, because it ruled on the merits of Dapec's motion.  Under these circumstances, we find that the fixture issue was not waived, and we review the bankruptcy court's decision on its merits.

The bankruptcy court's determination that the superstructure is not a fixture was a finding of fact.  See Washington Metro. Area Transit Auth. v. Precision Small Engines, 227 F.3d 224, 227 (4th Cir. 2000) (per curiam); First Wis. Nat'l Bank of Milwaukee v. Fed. Land Bank of St. Paul, 849 F.2d 284, 287 (7th Cir. 1988).  As such, it may be reversed only if it was clearly erroneous.  Fed. R. Bankr. P. 8013; First Wis. Nat'l Bank, 849 F.2d at 287.[6]

---

[5]The Money Store has not taken a position on this issue, presumably because of the subordination agreement it entered into with Dapec.  See supra note 2.

[6]Since this case is a "core" bankruptcy proceeding, see 11 U.S.C. § 157(b)(2)(K), we do not use the standard of review provided by state law.

Under Nebraska law, a court must look to three factors in determining whether personal property has become a fixture.  These factors are:

(1) whether the article or articles are annexed to the realty, or something appurtenant thereto; (2) whether the article or articles have been appropriated to the use or purpose of that part of the realty with which it is or they are connected; and (3) whether the party making the annexation intended to make the article or articles a permanent accession to the freehold.

Fed. Land Bank of Omaha v. Swanson, 438 N.W.2d 765, 767-68 (Neb. 1989) (citation omitted).  The first two factors, annexation and appropriation to the use of the realty, have value primarily as evidence of the owner's intent, which is generally regarded as the most important factor.  N. Natural Gas Co. v. State Bd. of Equalization, 443 N.W.2d 249, 257 (Neb. 1989).

One piece of evidence before the bankruptcy court was the affidavit of Mark Haskins (Haskins), the president and CEO of MBA Poultry.  In his affidavit, Haskins states that although the superstructure is "bolted to the floor or ceiling," the bolts can be taken out, and the superstructure "can be removed from the premises with no damage to the equipment or to the premises."   Haskins also states that he "always understood that the equipment could be removed at any time, without much difficulty or any damage to either the machinery or building."  According to Haskins, "it was never [his] intention to have any of the equipment become a permanent part of or accession to the . . . premises."

The president of Dapec, Peter Goffe (Goffe), signed an affidavit that to some extent conflicts with the affidavit of Haskins.  In Goffe's affidavit, he states that it took approximately seven weeks of work, averaging sixty-five hours a week, to

Willemain v. Kivitz, 764 F.2d 1019, 1022 (4th Cir. 1985).

complete the superstructure and the rest of the air-chill system. The entire system, he says, "was custom designed and constructed in order to be integrated into the plant." Goffe avers that the "ceiling of the air chill rooms is laid upon and is supported by the support superstructure." According to Goffe, the components of the superstructure are "welded together and affixed to the building," and "cannot be removed and reused in any other location or otherwise broken down as reusable component parts."

The bankruptcy record also includes color photographs of the superstructure. The photos support much of Goffe's affidavit. The photos show the superstructure being constructed in a large room with walls of concrete block. The room appears to be approximately sixteen feet high, twenty feet wide, and at least thirty-two feet long. The superstructure, which is composed of stainless steel beams, fills the dimensions of the room. At least five pairs of beams, spaced approximately eight feet apart, run vertically from the floor almost to the ceiling. Each pair of vertical beams is connected by four horizontal beams. The highest level of these horizontal beams spans the tops of the vertical beams, and the other levels run successively lower in intervals of about four feet. The horizontal beams are reinforced in the center of the room by approximately four-foot long vertical beams. These shorter beams run vertically between the horizontal beams, from the topmost beams straight down, from one beam to the next, and from the lowest beams to the floor. Although it is clear that most of the joints of the superstructure are welded together, it is not clear whether they all are, or whether a few of them are bolted together instead.

The record is inconclusive as to whether, as Goffe claims, the ceiling of the processing plant has been "laid upon" the superstructure. The photographs, which were taken during construction of the superstructure, show a gap between the top of the superstructure and the ceiling. According to Dapec, the ceiling was lowered after the photographs were taken, and it now rests on the ceiling. The appellees have not disputed this claim.

-11-

In analyzing the affidavits and the photographs, the bankruptcy court made three main points. First, it noted that the superstructure was only bolted down to the floor of the plant and not permanently attached to the walls or ceiling. Second, while the bankruptcy court noted that the superstructure was specifically designed for use in MBA Poultry's chicken processing plant, it observed that the building itself could be used for other purposes if the superstructure were removed. Third, the bankruptcy court relied on Haskins's affidavit to show that the parties did not intend the superstructure to be a fixture. In summary, the bankruptcy court found, "[i]t can be reasonably inferred from the evidence of the use, purpose, and method of construction of the superstructure that the parties intended it to be separate and distinct from the real estate."

Reviewing the bankruptcy court's decision, the first factor we address is the manner in which the superstructure is affixed to the real estate. In analyzing this factor, the bankruptcy court concentrated on the fact that the superstructure is only bolted down. In their briefs, the parties argue about the significance of this fact.

Under Nebraska case law, it is possible for an item that is merely bolted down to become a fixture. The SBA cites Swanson, 438 N.W.2d at 768, in which the Nebraska Supreme Court held that two grain bins were not fixtures, where they were merely bolted down to concrete slabs and were capable of being removed without any significant difficulty. In other cases, however, the Nebraska Supreme Court has found items to be fixtures even though they were only bolted down. For example, in Tillotson v. Stephens, 237 N.W.2d 108, 109 (Neb. 1975), the court treated another grain bin as a fixture, where the bin "was anchored to a concrete base and became an integral part" of the grain elevator to which it was connected. Similarly, in Oliver v. Lansing, 80 N.W. 829, 831 (Neb. 1899), the court upheld a trial court's finding that opera chairs in a theater were fixtures, where the chairs had been "specially adapted" to the theater and "affixed thereto by screws." These cases counsel us not to put too

-12-

much weight on the fact that the superstructure was only bolted to the floor of the processing plant.

In evaluating the superstructure's annexation to the real estate, we think it is more useful to examine how difficult it would be to remove the superstructure from the plant. An article is more likely to be a fixture when "removal of the article will injure the realty or will injure the article itself." See N. Natural Gas, 443 N.W.2d at 257-58. The affidavits submitted to the bankruptcy court conflict on this issue. The photographs in the record, however, resolve the issue decidedly in Dapec's favor. Looking at the photos, we can see no way in which the superstructure can be removed without causing substantial damage either to the plant, or to the superstructure itself, or both. For all practical purposes, the superstructure is part of the processing plant, and this fact weighs heavily in favor of finding that it is a fixture.

The second factor – appropriation to the use of the realty – also points strongly towards the conclusion that the superstructure is a fixture. Like the opera chairs in Oliver, the superstructure was specifically designed for use in MBA Poultry's processing plant. And, like the grain bin in Tillotson, the superstructure was integrated into the processing plant during several weeks of construction. The bankruptcy court discounted these facts, because, in its view, the real estate could be used for other purposes. The Nebraska Supreme Court, however, has not looked to the full range of purposes to which real estate might be applied, but rather to "the use to which [it] is applied." N. Natural Gas, 443 N.W.2d at 259 (emphasis added). The real estate in this case was being used as a chicken processing plant, and Bird Watchers, which purchased the plant in the bankruptcy sale, planned to continue that use. Under these circumstances, the superstructure was clearly appropriated to the use of the realty.

Finally, we believe MBA Poultry intended the superstructure to be a permanent feature of its processing plant. As the bankruptcy court observed, the principal

-13-

evidence against this conclusion is the affidavit of Haskins, MBA Poultry's president and CEO, who claims he had no such intent. Haskins, however, was not a disinterested party. He personally guaranteed the $1,000,000 NEDCO loan that was financed by the SBA, and he has a strong financial interest in seeing the SBA repaid from the bankruptcy estate.

The Nebraska Supreme Court has indicated that, to be trustworthy, evidence of intent should come primarily from objective sources, such as "the nature of the articles affixed, the relation and situation of the party making the annexation, the structure and mode of the annexation, and the purpose or use for which the annexation has been made." N. Natural Gas, 443 N.W.2d at 257; see also Pick, 408 N.W.2d at 255. For reasons stated above, we believe these factors point inescapably toward an intention on the part of MBA Poultry to make the superstructure a permanent part of its plant.

In short, the evidence plainly shows that the stainless steel superstructure is a fixture. The bankruptcy court's finding to the contrary was clearly erroneous. Accordingly, we remand the case for a determination of priority between Dapec's security interest in the superstructure and the security interest held by the SBA.

### C. Priority of Sewer and Water Bills

Tecumseh asserts that its liens for MBA Poultry's unpaid sewer and water bills have priority over Dapec's construction lien. Under Nebraska law,

> All special assessments, regularly assessed and levied as provided by law, shall be a lien on the real estate on which assessed, and shall take priority over all other encumbrances and liens thereon except the first lien of general taxes under section 77-203.

Neb. Rev. Stat. § 77-209. According to Tecumseh, its sewer and water bills have priority because its ordinances authorize a delinquent sewer or water bill "to be

-14-

collected as a special tax in the manner provided by law." Tecumseh City Code, §§ 3-121, 3-212.

Under Nebraska law, "[s]ewer use charges are not special assessments." Rutherford v. City of Omaha, 160 N.W.2d 223, 228 (Neb. 1968). Tecumseh concedes this point, but argues Nebraska law allows a municipality to treat such charges as if they were special assessments.[7]

Tecumseh's argument rests ultimately on two Nebraska statutes. First, Nebraska allows a city of the second class, such as Tecumseh, to collect delinquent sewer charges "in the same manner as other municipal taxes are certified, assessed, collected and returned." Neb. Rev. Stat. § 18-503. Second, Nebraska also permits cities of the second class to provide by ordinance for the collection of water charges and taxes. Neb. Rev. Stat. § 17-538. Neither of these statutes specifically permits a municipality to treat unpaid utility bills like special assessments.

Because they lack such provisions, the statutes cited by Tecumseh do not make unpaid sewer and water bills the equivalents of special assessments. In Nebraska, any statutory authorization to levy special assessments must be strictly construed against the municipality. Foote Clinic, Inc. v. City of Hastings, 580 N.W.2d 81, 84 (Neb. 1998). Although section 18-503 allows a municipality to collect sewer bills in the way it collects "other municipal taxes," it says nothing in particular about levying or collecting special assessments. Section 17-538, which authorizes the collection of water bills, says nothing at all about special assessment procedures. Construing these

---

[7]Special assessments differ from taxes generally in that they are directed at property which has received special benefits from public improvements. See NEBCO, Inc. v. Bd. of Equalization of City of Lincoln, 547 N.W.2d 499, 503 (Neb. 1996). Tecumseh does not argue that it is permitted to treat sewer and water bills like first liens for general taxes. See Neb. Rev. Stat. § 77-203 and § 77-208.

statutes strictly against Tecumseh, as we must, we hold that they do not give automatic priority to Tecumseh's sewer and water bills.[8]

While Nebraska law does not give MBA Poultry's unpaid sewer and water bills automatic priority, those bills may still be liens. See Neb. Rev. Stat. §§ 17-538, 17-925.01. Dapec does not contest the district court's holding that the sewer and water bills are liens. As liens, the unpaid sewer and water bills may or may not have priority over Dapec's construction lien under Nebraska's general rules governing lien priority. Thus, the district court correctly ordered the case remanded to the bankruptcy court for a new determination of priority.

## III.    CONCLUSION

We agree with the bankruptcy court and the district court that Nebraska's construction lien statutes do not give Dapec's construction lien priority over the security interests held by the Money Store and the SBA. Unlike the district court, we conclude the bankruptcy court clearly erred in finding that the stainless steel superstructure of MBA Poultry's air-chill line is not a fixture. We agree with the district court that the bankruptcy court committed a legal error when it gave Tecumseh's unpaid sewer and water bills automatic priority over Dapec's security interest.

We affirm the judgment of the district court in Case No. 01-2026, in which the district court approved the bankruptcy court's disposition of the construction lien issue. However, we reverse the judgment of the district court in Case No. 01-2028. Instead, we hold that the superstructure is a fixture, and we remand the case for a

---

[8]MBA Poultry's plant was apparently not in an extension district where special assessments might have been authorized by law. See Neb. Rev. Stat. §§ 19-2401 – 19-2407; Matzke v. City of Seward, 226 N.W.2d 340, 344-45 (Neb. 1975), overruled on other grounds, First Assembly of God Church v. City of Scottsbluff, 279 N.W.2d 126, 129-30 (Neb. 1979).

determination of priority between Dapec's security interest in the superstructure and the security interest held by the SBA. In accordance with these two rulings, we affirm in part, and reverse in part, the judgment of the district court in Case No. 01-2029, which upheld the bankruptcy court's decision to allow disposition of proceeds under its rulings on the construction lien and fixture issues. Finally, we affirm the judgment of the district court in Case No. 01-2480, and, like the district court, we remand that case for a new determination of priority between Dapec's construction lien and the unpaid sewer and water bills owed to Tecumseh.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.